[Civil No. 4403. Filed July 16, 1941.]

[115 Pac. (2d) 775.]

L. C. HOLMES and LYNN LOCKHART, Members of The Industrial Commission of Arizona, Petitioners, v. SIDNEY P. OSBORN, as Governor of the State of Arizona, Respondent.

Mr. George M. Hill, Mr. Mark Wilmer and Mr. Charles L. Strouss, for Petitioners.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley, Assistant Attorney General, for Respondent, Mr. Burt H. Clingan, of Counsel.

Mr. Jacob Morgan, *Amici Curiae.*

ROSS, J.—The petitioners instituted this proceeding by *certiorari* against the respondent, Governor of Arizona, for the purpose of testing the legality of their removal by him as members of the Industrial Commission of Arizona.

Petitioner Holmes was appointed to such office in March, 1933, by the then governor, Honorable B. B. Moeur, and at the expiration of such term was reappointed, for the term beginning January 8, 1940, by the then governor, Honorable R. T. Jones, with the advice of the senate, and was acting under this last appointment when the respondent ordered his removal therefrom.

Petitioner Lockhart was appointed in 1939, also by Governor Jones, with the advice of the senate, to fill out a term which began January 9, 1938, and will end January 8, 1944, and was acting under such appointment when the respondent ordered his removal.

The respondent was inducted into office on January 6, 1941. On February 17 he formally notified the petitioners and E. T. Houston, the third member of the Industrial Commission (appointed by Governor Jones in 1940, and confirmed by the senate, to fill a vacancy caused by the death of Honorable Sam Proctor), that two complaints had been filed with him charging all of them with inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in office and engaging in occupations and businesses other than their duties as

industrial commissioners, and petitioning for their removal from office; appointed February 23 as the date he would hear evidence for and against such charges, and served copies of such complaints upon the petitioners and the said Houston, which complaints are as follows:

"Honorable Sidney P. Osborn
 "Governor of the State of Arizona,
 "Phoenix, Arizona.
"Dear Governor Osborn:

"I am writing you this letter to advise you that while certain appointed state officials have not seen fit to respond to your request for their resignations, it is, without doubt, the considered judgment of a tremendous majority of the people of Arizona that you have not fulfilled your duty in that respect until or unless you now proceed to effect the removal of some of these officials from office. I refer specifically to the members of the Industrial Commission of Arizona. Many Arizona workmen are looking forward hopefully to a change in the membership of the Industrial Commission.

"To the end that right and justice be served and that this matter be properly and legally determined, I present to you as charges for the removal of the members of the Industrial Commission of the State of Arizona, the following:

"(1) That the said Industrial Commissioners, L. C. Holmes, Lynn Lockhart and E. T. Houston, are guilty of inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in their offices as such industrial commissioners.

"(2) I specifically charge Commissioner L. C. Holmes and Commissioner Lynn Lockhart with neglect of duty, inefficiency, malfeasance, misfeasance and nonfeasance in office, in that the said L. C. Holmes and Lynn Lockhart, as industrial commissioners of the State of Arizona, have throughout their holding of the said offices, failed and refused to provide fair and unbiased examinations and consideration and hearings to laboring men and women injured in the course of their employment in the industries of Arizona, and

have failed and refused to provide for and pay the benefits and the compensations set forth in the Workmen's Compensation Laws of Arizona. That, on the contrary, they have continually taken action to minimize and even deprive laboring men and women of such benefits and compensation.

"(3) I further charge that the said L. C. Holmes and Lynn Lockhart, as industrial commissioners of the State of Arizona, by their conduct in such office, have acted and voted to return and rebate to certain employers of Arizona approximately one million dollars of premiums paid by them in the past two years, thus making it apparent that either the Industrial Commission insurance rates to certain employers in Arizona are too high and should have been materially lowered, as is provided by law, or that said Industrial Commission is withholding, and has withheld, from injured laboring men and their widows and children one million dollars of the compensation rightfully due them and provided for them by law.

"(4) I further charge the said L. C. Holmes, Lynn Lockhart and E. T. Houston with inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in their offices as industrial commissioners of the State of Arizona, in that during their terms of office each of them, singularly and collectively, have shown unfairness, favor and discrimination in the making of awards to injured workmen; between employers and classes of employers in the fixing of rates and premiums for insurance under the Workmen's Compensation Law of the State of Arizona; in the distribution of medical work among the medical profession of the State of Arizona; all to the injury of the said compensation fund, and the injury of laboring men and women and of the people of the State of Arizona.

"(5) Upon information and belief, I further charge the said L. C. Holmes, Lynn Lockhart and E. T. Houston with inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in their offices as such industrial commissioners, in the administration of the Workmen's Compensation Law of the State of Arizona, in that in the investigation, hearing and *adjudication* of workmen's claims for compensation for injuries sustained in the course of their employment,

that said commissioners, and each of them, have, during their terms as such commissioners, used undue influence, duress, and arbitrary tactics, thereby depriving said injured workingmen and women of their rights and benefits as provided by the said Workmen's Compensation Act.

"(6) Upon information and belief, I further charge the said L. C. Holmes, Lynn Lockhart and E. T. Houston with delegating judicial authority to employees of the Commission, in the *adjudication* of claims under the said Workmen's Compensation Act, and with condonation and ratification of arbitrary abuses of such judicial powers on the part of such employees.

"Wherefore, I request that you fix a time and place for the hearing of said charges and for the production of evidence in proof thereof, and that upon said hearing and at the conclusion thereof, you, as Governor of the State of Arizona, remove the said L. C. Holmes, Lynn Lockhart and E. T. Houston, as members of the Industrial Commission of the State of Arizona, as is provided by Chapter 56, Article 9, Section 901, Arizona Code Annotated, 1939; that you advise said Commissioners of the date of said hearing; that you summon them thereto to appear and defend with respect to these charges; and that, under your hand and the seal of the State of Arizona, you issue subpoenas as may be requested by myself and by the said Commissioners, for the attendance of witnesses in proof or in defense of these charges; and for such other and further proceedings as you may deem meet or proper in the premises.

"C. P. FLYNN."

"Honorable Sidney P. Osborn
 "Governor of the State of Arizona
 "Phoenix, Arizona.
"Dear Governor Osborn:

"The undersigned, a citizen, resident and taxpayer of Phoenix, Arizona, and engaged as an employer in the storage and transfer business in Phoenix, hereby petitions you for the removal from office of Industrial Commissioners L. C. Holmes, Lynn Lockhart and E. T. Houston, as members of the Industrial Commission of Arizona, upon the charges hereinafter set forth:

"(1) Upon information and belief, I allege and charge the said L. C. Holmes, Lynn Lockhart and E. T. Houston with inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in their offices as such industrial commissioners, as hereinafter more specifically set out;

"(2) I specifically charge L. C. Holmes, Lynn Lockhart and E. T. Houston with inefficiency, neglect of duty, misfeasance, malfeasance and nonfeasance in office, in that, in violation of the provisions of the Workmen's Compensation Laws of the State of Arizona in respect to the fixing of rates and premiums, they have failed to determine the hazards of the different classes of occupations and industries and fix the rates of premiums therefor at the lowest rate consistent with the maintenance of a solvent state compensation fund with proper surpluses and reserve;

"(3) Upon information and belief, I further charge L. C. Holmes, Lynn Lockhart and E. T. Houston with inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in office, in the manner in which they, as industrial commissioners, have administered the funds in their charge, in the expenditure thereof for the operation of said Commission and the administration of said law; in the collection of premiums from certain employers; in the condonation of delinquencies in the payment of said premiums on the part of certain employers; in the employment of employees of said Commission; in the purchase of equipment; and in the distribution of medical work of said Commission;

"(4) Upon information and belief, I further charge the said Lynn Lockhart with engaging in an occupation and a business other than his duties as such Commissioner, during the time that he has held such office, in that he has engaged in various political occupations and businesses in the promotion of the political welfare and candidacy of one R. T. Jones, using the benefits and privileges of his office to further the political interests of the said R. T. Jones, and that in this connection he has used a major portion of his time in the office of the Industrial Commission in interviewing political applicants for positions under the administration of the said R. T. Jones, while Governor

of the State of Arizona, and other than applicants for positions with the said Industrial Commission;

"(5) Upon information and belief, that the said Lynn Lockhart was engaging in the occupation and business of cattle ranching and farming during the time that he held his said office as Industrial Commissioner, as is prohibited by Section 56–901 of the Arizona Code Annotated, 1939;

"(6) Upon information and belief, I charge the said L. C. Holmes with engaging in the occupation and business of farming, while holding office as an industrial commissioner of Arizona, in violation of the provisions of the Workmen's Compensation Act, by engaging in the business of vegetable and fruit farming and packing, as a responsible advisor and director of the activities and farming operations of the Tracy-Holmes Fruit Company, a corporation (of) which he is and was, at all times during his term as said industrial commissioner, the major stockholder and president.

"The undersigned respectfully requests that these charges be received by you as Governor, and that you take such steps as in your opinion are necessary for the hearing of said charges, advising me of the time and place thereof, so that I may produce proof in support of the same, and that upon the hearing of said proof you will remove the said L. C. Holmes, Lynn Lockhart and E. T. Houston from the office of Industrial Commissioner, as is required of you by law.

"GEORGE COFFIN."

To these charges the commissioners filed various motions, all of which were attempts or efforts to have the charges made more definite and certain. One of such motions petitioned the respondent to require the informers Flynn and Coffin to furnish a bill of particulars showing wherein they had been guilty of inefficiency, neglect of duty, etc. This motion and all others, having for their object the securing of information as to the particulars in which the commissioners had been derelict in their duties, were overruled by the respondent and a hearing was had on the

charges as stated by the informers. Neither of the informers was a witness nor gave any word of testimony to sustain his charges. Respondent, however, called the three commissioners as witnesses and undertook by cross-examination by employed counsel to extract from them some evidence showing that for some reason or other they should not remain members of the commission. At the close of the evidence, about 90% of which was testimony of the commissioners on such cross-examination, the respondent made findings, which, in substance, are as follows:

1 and 2. That Holmes and Lockhart were engaged in a business or occupation and held offices of trust or profit other than industrial commissioners. The particular finding as against Holmes is that he owns and operates the Tracy-Holmes Fruit Company, a corporation engaged in farming and marketing farm products in Maricopa County, and the particular finding as against Lockhart is that he owns and operates a large ranch and cattle business in Apache County and is engaged in looking after such business, to the neglect of their duties as industrial commissioners.

3. That the commissioners Holmes and Lockhart are inefficient and lack requisite knowledge of the workmen's compensation law.

4. That Holmes and Lockhart were guilty of wrongful acts in underwriting workmen's compensation risks, as follows: (a) failure of the commission to revise annually the rates and rate schedules; (b) failure of the commission to collect delinquent premiums; (c) the maintaining of excessive reserves by the commission; (d) failure of the commission to collect a six months' deposit from Barrett & Hilp and Macco.

5. That Holmes and Lockhart were guilty of wrongful acts in connection with their dealings with injured workmen.

6. That the commission (1) has expended moneys of the compensation fund in excess of the amounts required to properly administer the act; (2) that expenses of the commission have increased out of proportion to the business of the commission; (3) that Wm. R. Sneed, a claimant, whose claim was File No. L-9731, was paid an award which was charged against the Goetz Ice Company despite and notwithstanding the fact that the commission's files and its own investigators' reports show that Sneed was not an employee of the Goetz Ice Company, or an employee of any insured employer, but was employed by an uninsured independent contractor at the time of his injury.

7. That Lockhart engaged in various political activities, to the neglect of his duties as industrial commissioner.

Upon these findings, respondent ordered the removal of Holmes and Lockhart, but declined to remove the third member, Houston, because he apparently thought Houston was sincerely endeavoring to adequately prepare himself for the functions of his office.

The provisions of the law creating the Industrial Commission and providing for its membership, the manner of their selection, their tenure and removal, may best be seen by quoting them as originally passed. Chapter 83, Laws of 1925, sections 1, 2 and 3, reading as follows:

"Section 1. Commission Created, Membership, Terms.—There is hereby created the Industrial Commission of Arizona to be composed of three members who shall be appointed by the Governor, one member of said commission shall be appointed for a term of two years, one member for a term of four years and one member for a term of six years from the date this act becomes effective; and thereafter each member shall be appointed for a term of six years by and with

the advice of the Senate. Not more than two members of the commission shall belong to the same political party.

"Section 2. Removals for Cause.—The Governor at any time may remove any members of the commission for inefficiency, neglect of duty, malfeasance, misfeasance, or nonfeasance in office.

"Section 3. Limitation, Business and Political. No commissioner shall hold any office of trust or profit, or engage in any occupation or business other than his duties as such commissioner; and no commissioner nor any regular employee of the commission shall serve on any committee of any political party."

These three sections are condensed into one in the revision of 1928 (section 1391) and carried forward into the 1939 Code as section 56–901. Hereafter, instead of citing section 56–901, however, our references will be to the law as originally written, that is, sections 1, 2 and 3.

The petitioners' first contention is that the only constitutional method by which they can be removed is by impeachment, and that that part of section 56–901, Arizona Code 1939 (§ 2, chap. 83 *supra*), that undertakes to authorize the governor to remove a member of the commission for cause is unconstitutional. They base this contention upon section 2, part 2, article VIII of the Constitution, the material part of which reads:

" . . . The governor and other state and judicial officers, except justices of courts not of record, shall be liable to impeachment for high crimes, misdemeanors, or malfeasance in office, . . . "

If this contention is right, then the law authorizing the governor to remove for cause is in conflict with the Constitution and cannot stand. In *Sims* v. *Moeur*, 41 Ariz. 486, 19 Pac. (2d) 679, 681, we said, concerning the constitutionality of the statute in question:

"The section of the Compensation Law (1391) which provides that the members of the industrial commission shall be appointed by the Governor by and with the advice and consent of the senate also contains this provision: 'The Governor may remove any member of the commission for inefficiency, neglect of duty, malfeasance, misfeasance, or nonfeasance in office.' This provision does not in any way conflict with the state Constitution. That instrument is silent as to the power of removal from office, and in such case it is left with the Legislature to regulate it by statute. The manner of appointment of the commissioners, as well as the manner of their removal, is peculiarly a legislative matter. . . . "

It is evident from what we said the point now made was not called to the court's attention and was not considered. However, we think what was said is, in the main, correct.

██ Under the above quoted language from the Constitution, the officers liable to impeachment evidently are those the members of the constitutional convention had provided for. An inspection of that instrument discloses that every executive and judicial officer named in it is elective. The impeachment process is, by such provision, confined to state officers and judicial officers both state and county, except justices of courts not of record. The process is not available as against justices of the peace, although such office is elective and a creature of the Constitution. It is available as against all other elective constitutional officers.

██ It is true, as the petitioners contend, that the state Constitution is a limitation upon the powers of the legislature, but we think no one would assert that the framers of that instrument, by providing for certain named state officers and for their removal by impeachment, intended to prohibit the legislature from creating other offices thought to be necessary and

in the interests of good government, and to fix the incidents of appointment and removal thereof. The limitation on legislation in that field is that removal from state elective offices shall be by impeachment and only for the causes mentioned in the Constitution. It would seem that if the legislature has the power to create the Industrial Commission it should possess ample power not only to provide for the appointment and qualification of its members but also for their removal and the causes for which they may be removed. Whether the process of impeachment is exclusive depends upon the fundamental laws, and these laws are so different that the decisions under them lend very little aid in reaching a conclusion under ours. The views here expressed find support, we think, in many of the cases. Section 18, article 3 of the Constitution of Wyoming is, for all intents and purposes, the same as our section 2, part 2, article VIII, *supra,* and in *People* v. *Shawver,* 30 Wyo. 366, 222 Pac. 11, 26, 28, the court construed the words therein "the Governor and other state . . . officers" as meaning the elective officers provided for by the Constitution of the state. After reviewing several cases from other states in support of its conclusion, the court said:

"In view of the serious nature of an impeachment proceeding, and the tendency of the courts to limit the operation of general terms, in Constitutions defining its scope, so as to exclude therefrom all minor and subordinate officers, even though they might come strictly within the terms so employed, it seems clear that the term 'other state officers,' as found in our Constitution providing for such proceeding, should not be construed as including or intended to include every officer who, for other purposes, might properly be classed as a state officer. The words are used in connection with the office of Governor, and may, for that reason, as well as the reason above suggested, be limited to officers of a grade that might properly be included with that of Governor, to accomplish the pur-

pose of the provision. There must be some line of distinction, and we are disposed to leave the question where it was left in the case of *State* v. *Grant, supra* [14 Wyo. 41, 81 Pac. 795, 82 Pac. 2, 1 L. R. A. (N. S.) 588, 116 Am. St. Rep. 982], leaving the court still inclined to the opinion, under the existing relevant constitutional and statutory provisions, that the officers declared liable to impeachment, aside from judicial officers, are the Governor and the other elective state officers mentioned in section 11 of article 4 of the Constitution; such other officers so mentioned being the secretary of state, the auditor, the treasurer, and the superintendent of public instruction. . . . ''

It would be an interminable job to discuss and distinguish all the cases. It may be said they are generally susceptible of reconciliation on grounds of varying constitutional provisions.

If it is suggested that such a construction of our Constitution will leave statutory elective state officers immune to impeachment or any other removal process, we would call attention to section 1, part 1 of article VIII of the Constitution, which provides that ''Every public officer in the state of Arizona, holding an elective office . . . is subject to recall,'' and, as was held in *Abbey* v. *Green,* 28 Ariz. 53, 235 Pac. 150, for any reason at all.

Our Constitution has many new features, especially in the faith it reposes in the people. Unlike most of the constitutions of the older states, it provides for the election by the people of the heads of the different departments of state, instead of conferring that power on the governor. It provides for frequent elections and authorizes the people to make and unmake laws and between elections to recall its officers when dissatisfied with their services. The constitutional convention, of which the respondent was a distinguished member, believed the people should, where possible, have the say as to the election of their public servants

and also as to their removal. They provided for the appointment and removal of only two minor state officers, to wit, the clerk of the supreme court and the reporter of decisions of that court. These officers the court is empowered to appoint and remove at pleasure.

For nearly thirty years the state government has operated under that instrument and apparently with a measure of satisfaction, except at each change of administration there is a hue and cry for the incoming administration to make a "clean sweep" of the appointees of the outgoing one, but fortunately the laws do not permit that.

The governor's powers are those the Constitution confers on him and such additional powers as the legislature reposes in him. In the creation of new offices by the legislature that body may empower the governor to make appointments thereto, with the advice and consent of the senate, or it may give him alone that power with the right of removal. When the appoinment is to be approved by the senate, the governor may not remove except in the manner and for the cause or causes named by the legislature. As was decided in *McGinness* v. *Hunt, ante,* p. 70, 111 Pac. (2d) 65, he can no more ignore the law than any other citizen.

The petitioners very justly complain of the indefiniteness and uncertainty of the charges. They were entitled to know in advance what they were charged with in order to prepare their defense. The statute provides that the governor may remove commissioners and enumerates the grounds for which the removal may be made. They are: inefficiency, neglect of duty, malfeasance, misfeasance and nonfeasance in office. Section 2, *supra.* All these grounds, except the first, imply wrongdoing, some act of omission or commission in office the law required to be done which

was not done or if done was done in an unlawful manner.

" 'Malfeasance is doing that which officer has no authority to do, and is positively wrong or unlawful.'

" 'Misfeasance by an officer is doing in a wrongful manner that which law authorizes or requires him to do.'

" 'Nonfeasance by an officer is the substantial failure to perform duty.' 2 Words and Phrases, Fourth Series, pages 617, 696, 801." *State* v. *Barnett,* 60 Okl. Cr. 355, 69 Pac. (2d) 77, 87.

Neglect of duty and nonfeasance mean the same thing. Inefficiency is the quality of being incapable or indisposed to do the things required of an officer. These are the only grounds on which the governor is permitted to remove a commissioner and clearly refer exclusively to his conduct in his official and not his private capacity. No act, therefore, whether it be forbidden by the terms of the compensation law or any other positive statute, is ground for removal unless that act so affects his conduct in office as to constitute inefficiency, neglect of duty, misfeasance, malfeasance or nonfeasance in the discharge of his official duties.

■■■■■ The charges do not set forth the particular wrongful, negligent or unlawful acts of which petitioners were supposed to be guilty and, while common fairness required that they be advised thereof in advance, the proceeding before the respondent was not one before a judicial tribunal, although he actually and really exercises some of the functions of such a tribunal. The statute does not provide the procedure the governor shall follow in the matter of removing officers for cause and he may for that reason adopt any method, however arbitrary, that he wishes. It is, however, absolutely essential to his jurisdiction to remove that there be evidence to sustain the grounds, or one of the grounds, of removal specified in the statute.

We think the rule as announced in *People* v. *Shawver, supra,* is a fair one. It is as follows:

" . . . And we agree with the respondent's contention that judicial cognizance of the governor's action does not reach beyond the jurisdictional inquiry. But that the court may go that far, where the removal is authorized only for cause or for causes specified in the Constitution or statutes, is, we think, well settled; at least that is the prevailing rule, and we think more reasonable than a rule denying the right of judicial inquiry or review in such cases. That is to say, the court may inquire into the existence of the jurisdictional facts, among which are:

" 'Whether the charges upon which the removing power acted were legal cause for removal, or whether the cause was sufficiently specified.' 22 R. C. L. 574; 29 Cyc. 1410; 23 Ency. Law (2d Ed.) 429; Mechem on Pub. Off. § 456; Throop on Pub. Off. §§ 392–398; *Village of Kendrick* v. *Nelson,* 13 Idaho 244, 89 Pac. 755, 12 Ann. Cas. 993; *State* v. *Hawkins,* 44 Ohio St. 98, 5 N. E. 228; *State* v. *Hay,* 45 Neb. 321, 63 N. W. 821; *State* v. *Frazier,* 47 N. D. 314, 182 N. W. 545.

"The court say, in *Ekern* v. *McGovern,* 154 Wis. 157, 142 N. W. 595, 46 L. R. A. (N. S.) 796:

" 'An officer exercising such power . . . acts in a *quasi* judicial capacity, and the matter of procedure must be of a *quasi* judicial character, and as the officer is an inferior tribunal, as such he must be amenable to the court when acting in excess of the jurisdiction conferred. . . . Neither this nor any of the numerous authorities go further than to hold that excess of jurisdiction is jurisdictional. . . . Whether the Governor, exercising the power of removal, acquired jurisdiction to act and proceeded to a finality without excess of jurisdiction, may be inquired into whenever the result is called in question collaterally or directly.'

"In a note to *State ex rel. Kinsella* v. *Eberhart,* 39 L. R. A. (N. S.) 788, it is said:

" 'But it seems that the courts will look into the questions of the Governor's power and jurisdiction, and of the legality or existence of the ground assigned by the Governor.'

"In the cited Idaho case, it was held quoting from the syllabus by the court:

" 'Where a statute provides that an officer may be removed for certain specified causes, the order of removal must be based and founded upon some one or all of such causes, and cannot be made for other causes.' "

 Acting upon the assumption that the charges sufficiently set forth a cause or causes as named in the statute to give the governor jurisdiction to proceed with the hearing, as he did, we now turn to an examination of such grounds. The first is that the petitioners Holmes and Lockhart engaged in a business or occupation and held offices of trust or profit other than members of the Industrial Commission. It will be noted that the statute does not make such conduct, if a fact, a ground of removal. As before stated, the grounds for removal are "inefficiency, neglect of duty, malfeasance, misfeasance, or nonfeasance in office." See section 2. Section 1 provides that no more than two of the three members of the commission shall belong to the same political party, but a violation of it is not made a ground for removal of a commissioner. If a governor should appoint all three from the same political party and the senate consent thereto, although it would be a violation of the law, it would not be a ground for removal. So, while, in section 3, it is provided that "no commissioner shall hold any office of trust or profit, or engage in any occupation or business other than his duties as such commissioner," if he does it is not made a ground of removal. This is not a prohibition against a commissioner owning a business or having an occupation. It would hardly be possible to find a person fit for the position of commissioner who had no business or occupation, and one could hardly imagine a governor who would appoint such a person. If the appointee to the office of commissioner is, for instance, a carpenter, he

would not be required to sell his tools or refrain from repairing his home at odd times or of evenings. If he were a builder or architect, we can see no reason why he could not incorporate his business and employ others to carry it on. And if he should advise its managers and agents on holidays, Sunday and at times when his official duties did not require his attention, he would not be engaged in the occupation or business of a builder or architect. To "engage in any occupation or business" (§ 3, *supra*), as that phrase is here used, we think means that the person is giving time, energy and attention to his own affairs that rightfully belong to the state. An occasional reversion to his occupation, trade, business or profession for the purpose of preserving and keeping it for himself and his family when he no longer is an officer is not engaging in an occupation or business in the sense intended by the legislature to be forbidden. If a man, in order to hold the office of industrial commissioner, had to sell all that he had and give it to the poor or the politicians, no one "worth a whoop" would take the office. If a commissioner engages in an occupation or business to the extent of neglecting his official duties, we think he may be removed for such neglect, for "neglect of duty" is a cause for removal. There is no doubt the intent was that members of the commission should devote their time during office hours to the duties of their office and not to outside interests. Whatever the reason may be, the legislature did not make the engaging in another occupation or business than commissioner a ground of removal and for that reason the governor cannot make it a ground of removal. We repeat, if the commissioner occupies himself in a business or occupation other than his official duties to the extent of neglecting such duties, the governor may remove him for nonfeasance in office or neglect of duty, but not otherwise.

The evidence concerning Holmes' activities outside of his office may be summarized as follows: In 1931 he and a man by the name of Tracy were incorporated, with a capital stock of 500 shares, under the name of Tracy-Holmes Fruit Company, to carry on farming operations. In 1933, the same year he was first appointed a commissioner, he bought Tracy's stock and became the sole stockholder. At or about the time he took office, he resigned as president of the corporation but remained as a member of the board of directors, the other two members being Sidney B. and William A. Moeur, to each of whom he transferred a share of stock. The corporation thereupon employed a general manager and superintendent, who thereafter looked after and cared for the farming operations of the corporation and was paid for his services $150 a month, and certain bonuses, amounting at date of the hearing to $10,000. Since then Holmes has not had any authority to hire or discharge employees of the corporation and has taken no active part in its management. The superintendent, Norman Anderson, has decided the kind of crops to plant, the expenditures of money to be made and has looked after the marketing of the crops grown. A very few times Holmes has talked with creditors of the corporation who have seen him at the office of the commission. He has never made any purchases for the corporation; goes to the ranch about once a week; most of the time does not see the superintendent but talks with him over the telephone as much as twice a week, such talks being about rent due him from the corporation for lands of his the corporation is farming. The corporation owns no lands but rents from Holmes and pays him the prevailing prices for similar lands. Out of the rent he has paid the taxes on land, water charges and interest on borrowed money, which has left very little for him. He and his wife have guaranteed some

renewal loans made to the corporation before his appointment to the commission and he has at times advanced to it small amounts as needed to meet obligations. · He has signed a few checks for the corporation; has made several trips to California and has had numerous long distance telephone calls in connection with mortgages on his land.

From this evidence, the respondent draws some conclusions, as that Holmes owns 99.6% of the corporation's stock; that such corporation is a successful business concern but has never paid an income tax or a dividend, all net earnings going for rentals and bonuses; that the corporation and Holmes are one and the same; that Holmes' income approximates the net income of the corporation; that he received the past three years from the corporation $55,000 and only $12,000 as industrial commissioner; that there is no substantial difference between the ranching operations of Holmes now and prior to his appointment, nor in the management of the corporation, nor in his so-called landlord interest, nor in his farming operations, nor his management and direction of such operations.

Most of the findings, if true, are immaterial. Suppose the corporation is Holmes' *alter ego,* that does not prove nor tend to prove Holmes manages it or devotes any time to it. It may be managed by others than the majority or sole stockholder. Again, suppose Holmes is paid large dividends by the corporation, it would be nothing unusual, and if he failed to pay income tax it would be no proof that he devoted any time to the farming operations of the corporation. The finding that the farming operations since Holmes' appointment as commissioner are the same as before is not supported by the evidence but is contrary thereto.

That part of the finding to the effect that Holmes held an office of trust or profit has not a scin-

tilla of evidence to support it. It was made by respondent no doubt in the belief that because Holmes had entered into an agreement with Sidney and William Moeur and the corporation's manager that he would hold in trust 250 shares of the corporation, bought of Tracy for them, to be delivered to them upon the happening of certain future events, constituted an office of trust or profit. Such a function is entirely private. As we understand it, an office of trust or profit is created by law and the occupant performs his duties pursuant to statute. An example of an office of trust is the office of regent of the state university and of profit the office of sheriff or constable. *McCluskey* v. *Hunter,* 33 Ariz. 513, 266 Pac. 18, 24. In that case we said:

"In *Winsor* v. *Hunt,* 29 Ariz. 504, 243 Pac. 407, this court said that before a position or employment can be termed an office it must possess these three elements:

" 'The specific position must be created by law; there must be certain definite duties imposed by law on the incumbent, and they must involve the exercise of some portion of the sovereign power.' "

The outside activity of Lockhart found by respondent is the ownership of a cattle ranch in Apache County, which he manages and operates for the benefit of himself and family. The evidence in support of this finding is that in 1935, some four years before he was appointed commissioner, Lockhart caused to be organized the King-Midas Investment Company to hold assets and property in trust for the use and benefit of his three minor children; that he employed men to manage, take care of and handle everything on the ranch; that in the summertime he tried to spend the week-ends at the ranch with his wife and children; that he has made advances from time to time to assist in the operation of the ranch; has borrowed money to

that end in his own name and has also bought and sold cattle in his own name on account of the ranch. The ranch has not been a paying investment and, if it were, the proceeds would all belong to his three minor children. The evidence does not show or tend to show that Lockhart neglected to attend his office regularly during office hours or to perform the duties thereof because of the ownership of said ranch and the attention paid to it by him.

The finding by respondent that Lockhart was holding an office of trust or profit seems to be based on his relation to his children and the King-Midas Investment Company, but, as above noted, in the discussion of the same point in the Holmes matter, there is nothing to support such a finding.

The evidence shows that Lockhart during the political campaign of 1940, took an active interest in the candidacy of R. T. Jones for the office of governor, devoting some time to such candidacy. The respondent finds such to be the fact and assigns it as a reason for the removal of Lockhart. Such activity or interest is no ground for removal of a commissioner. The prohibition in section 3, *supra,* is against a commissioner or any regular employee of the commission serving on any committee of a political party. There is no evidence that Lockhart violated such prohibition.

The respondent next bases his order of removal of the commissioner-petitioners on the ground that, although Holmes has been a member of the commission for eight and Lockhart for one and one-half years, they have not so familiarized themselves with the workmen's compensation law and the rules of the commission as to be able to perform efficiently the duties of commissioners. Stated another way, that they are inefficient. Under section 2, *supra,* "inefficiency" is a ground for removal. It is an easy matter

to make such accusation but it is not always easy to refute it, especially in the absence of specific charges. We should, in this connection, state that the compensation law does not otherwise than in sections 1, 2 and 3, *supra,* prescribe the qualifications of a commissioner. In the life of that law, we have had no appointee educated and trained in the duties of such office, although the personnel has changed many times. The commissioners have uniformly been selected from the body of citizens of the state, not on the basis of their learning and experience in administering compensation laws or work of similar nature, but on the basis of their general familiarity with the people of the state and the activities and industries thereof. They have been selected from different pursuits or businesses so as to give all industries representation, if possible, and of course have been men of standing and good repute in their communities. In other words, they have been men of the kind and caliber the law contemplated would be chosen to administer the compensation law. None of them to date has been a lawyer, a doctor, an engineer, a certified accountant, an actuary, etc., and it was not expected that they should be, for section 56–905, Arizona Code 1939, provides:

"The commission may employ actuaries, accountants, inspectors, examiners, experts, clerks, physicians and other assistants, and fix their compensation. . . ."

The charges of inefficiency as also the finding are too general and indefinite to form the basis of an order of removal. It is obvious that if petitioners are removed, the men appointed to fill the vacancies, if the spirit of the law is followed, will be chosen from among the citizenry much as they and their predecessors have been chosen. In other words, insurance

men, actuaries, lawyers, doctors, engineers, would not be put in their places.

 This body of average citizens, under the compensation law, has many and extensive powers. Generally, they are:

"The commission shall have full power, jurisdiction and authority to administer and enforce all laws for the protection of life, health, safety and welfare of employees in every case and under every law, where such duty is not now specifically delegated to any other board or officer, and in such latter cases; to counsel and advise and assist in the administration and enforcement of such laws; to investigate, ascertain and determine such reasonable classification of persons, employments and place of employment necessary to carry out the purposes of this article. . . .

"All orders of the commission in conformity with law shall be valid and in force and *prima facie* reasonable and lawful until found otherwise in an action brought for that purpose pursuant to the provisions hereof, or until altered or revoked by the commission. . . . " Section 56–907.

By section 56–908 any employer or other person interested in any order of the commission may petition for a hearing thereon and after the hearing, if dissatisfied with the order, may, under section 56–914, commence an action in the superior court to set aside, vacate or amend such order. Section 56–916 reads:

"No court of this state, except the superior court and the Supreme Court on appeal, shall have jurisdiction to review, vacate, set aside, reverse, revise, correct, amend, or annul any order of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its duties; provided, that the writ of *mandamus* may issue from the Supreme Court to the commission in all proper cases, and that an appeal may be taken from the superior court to the Supreme Court in all cases."

Notwithstanding that under the law the exclusive power to review orders of the commission as to classifications and rates of premiums to be paid by employers in the various classes and hazards, and in fact all other orders, has been expressly conferred on the courts, the respondent undertakes to make such orders a basis of removal. Since the orders fixing rates and classifications have not been objected to by any employer or other interested person, or modified by any court order, they are binding upon everybody. When under the law the commission makes an order any employer or any other interested person may object to it and have his day in court as to its appropriateness or justness and, if he does not resort to the courts, the assumption must necessarily follow that he is not dissatisfied therewith. It seems rather remarkable that procedural matters of the kind, when fixed by the legislature as the proper avenue to ascertain whether orders of the commission are just and fair, should be ignored and a course adopted at variance with such provisions and in disregard thereof. For instance, respondent finds the rates are excessive and that by reason thereof the compensation fund is excessive, especially its surpluses and reserves and the catastrophe reserve. We think not even the governor of the state can question the orders of the commissioners made for the conduct of their business as insurance carriers. It is their duty to ascertain the hazards of the different industries of the state, to classify them in accordance therewith and to fix the rates of premiums based upon loss experience and such other data as are available. In doing so they have the assistance of expert actuaries, accountant and others, men experienced in the field of accident and liability insurance, and when, with such assistance, they make an order fixing classifications and rates, and no fraud or

mistake is charged, and no appeal is taken, their order is final and binding.

▆ The respondent found petitioners guilty of certain acts of neglect of duty or nonfeasance, such as:

(a) Failure to revise annually the rates and rate schedules. Under the law as originally enacted, it was the duty of the commission to make a readjustment of the rates annually, section 38, chapter 83, *supra;* section 1414, Revised Code of 1928, but by chapter 84, Laws of 1939, that requirement was omitted. Section 56–924, Arizona Code 1939. ·It is apparent from the context in which the word ''readjustment'' is used that it is not synonymous with revision. It has reference to change in credits due to past experience. But if it was ever intended that rates should be revised annually, it is no longer required and has not been since 1939.

▆ (b) Failure to collect delinquent premiums. The only evidence to support this finding is that of Holmes and Lockhart. They both frankly stated that there are losses however careful the commission is. The annual premiums for the year 1940 were over $2,000,000 and of that they lost something less than $1,000 by reason of failure to collect. In good times the insured pay premiums more promptly. Delinquencies arise occasionally through the employer's underestimation of his payrolls. During the eight years of Holmes' service as a commissioner, he states that between ten and one hundred suits have been brought for premiums. At the time he became a member of the commission there was one pending against the Lightning Delivery Company, of which George Coffin (informer) is a member, for several thousand dollars and such suit is still pending. The delay in bringing the matter to trial is caused by the defendant. Coffin's or the Lightning Delivery Company's delinquencies arose through the employer underesti-

mating its payroll. The evidence is that the commission is diligent in its efforts to collect all premiums and that the losses are slight as compared to the vast sums involved.

 (c) The maintaining of excessive reserves. All the testimony, that by commissioner Holmes and the experts, is that reserves are reasonable. The excessive reserves, if any, arise because of excessive rates and, as before stated, the order fixing classifications and rates cannot be questioned except as provided by statute.

 (d) Failure to collect a six months' deposit from Barrett & Hilp and Macco (the contractor building the Bartlett Dam). It seems the commission has a rule that requires employers to make a six months' deposit of premiums. In this case the employer paid its premiums monthly in advance and for that reason and because the employer was bonded the commission required it to deposit only a two or three months' premiums instead of six. This irregularity, if it may be so characterized, certainly harmed nobody. It is not claimed that any premium was lost by reason thereof.

 Respondent finds the petitioners were guilty of "wrongful acts" in dealings with injured workmen and bases his order of removal on such acts. The compensation law prescribes the circumstances under which an employee may recover from his employer compensation for injuries sustained in the course of his employment. It provides that the employee must make an application to the commission, on forms furnished by it. When that is done, it becomes the duty of the commission to investigate the facts and circumstances of his injury and if satisfied that the claim is compensable to award compensation to the employee according to certain schedules fixed by law. The procedure followed by the commission is informal and not

in accordance with the rules of law as to the admission of evidence. If the employer, or the employee, or the insurance carrier is dissatisfied with the award, the law provides that he or it may have a review thereof by the Supreme Court. The decision of award by the commission is not final. If it were, the interested parties might well claim that they were not given their day in court. Any aggrieved party, however, may have the award reviewed by a proceeding in *certiorari* to the Supreme Court. Such proceeding brings the whole record before the commission to this court for examination to determine if the commission has acted within its jurisdiction in making the award. In such record is included the evidence the commission had before it when making its decision. Long before Holmes and Lockhart became members of the commission, this court, in *Federal Mutual Liability Insurance Company* v. *Industrial Commission* (composed of Cleve W. Van Dyke, R. B. Sims and Burt H. Clingan), 31 Ariz. 224, 252 Pac. 512, laid down the rule that the court would not undertake to weigh the evidence when it was conflicting but would accept the commission's decision thereon. That was the first case brought to this court under the compensation law and the rule there announced has been since adhered to. This court took the view that, while the commission was not a court or a judicial tribunal, it exercised *quasi* judicial functions in passing upon the question of the employer's liability for compensation and that, because the commission was not bound by the rules of evidence like a court, it was fairer to the employee to accept the commission's decision when the evidence is conflicting. *Blankenship* v. *Industrial Comm.*, 34 Ariz. 2, 267 Pac. 203.

Any acts arising out of proceedings before the commission in making awards may be reviewed by the courts and if wrongful may be corrected in a judicial

manner. It was never contemplated that errors of judgment on the part of the commission should be punished by the executive department or that such errors should be a ground of removal but that they should be corrected by the courts.

The respondent found the petitioners guilty of nine so-called "wrongful acts." If it be granted that there is a foundation for such finding, it simply means that the commission and the respondent do not agree as to the facts or law. It does not mean that the petitioners acted corruptly but simply used bad judgment, so we disregard such so-called wrongful acts as not within the respondent's jurisdiction but as matters solely for the courts. In passing, however, we wish to say we have examined each of such acts and if we were permitted to pass on the facts of each we would have to disagree with the respondent.

There come before the commission annually from 15,000 to 18,000 cases and it may be imagined that some of the claimants for compensation are not given awards. It is possible that the commission errs in some of the cases, indeed, it is probable, for all human institutions commit error. However, perfection and absolute accuracy are not expected; all that can reasonably be demanded is an honest and conscientious effort to do the right thing. It is too bad if some who are entitled to compensation are denied it, but it must be remembered that all claimants for compensation are not entitled to it. It is as much the duty of the commission to deny compensation to a malingerer or to one who is not an employee as it is its duty to grant compensation to the honest employee who is actually injured in the line of duty. The compensation fund is not a "grab bag" for every person who would like to enjoy its contents but it is made up by employers to take care of those covered by the law. It would be a mockery of justice if the commissioners felt it neces-

sary to placate every applicant for compensation by an award whether he was entitled to it or not, or that they should be subjected to removal at the instance of every malignant or disappointed claimant for compensation.

We come now to the sixth finding by the respondent, the substance of which we have set out in the earlier part of this opinion. If the commission has expended from the compensation fund moneys in excess of the amounts required properly to administer the act, as the respondent finds, it should be easy to point to the evidence thereof. To support this finding, apparently reliance is had on the testimony of Dr. Ralph F. Palmer, who was the Medical Advisor of the commission for the six years preceding July, 1939, and on the testimony of Dr. Alfred C. Kingsley, who was appointed such advisor to succeed Doctor Palmer. We have read this testimony and about the only thing we discover therein is that these physicians differ somewhat in the medicines used to treat compensation patients. Also that Doctor Palmer, as his title implies, limited his services mostly to advising, whereas Doctor Kingsley, in addition to advising the commission, actually administered general treatment in compensation cases. There is to be gathered from such testimony that Doctor Kingsley spent more for medicines and apparatus than did his predecessor, but how much we cannot tell as the testimony contains no comparison of expenditures. There are vague insinuations by counsel who questioned Doctor Kingsley that some of the medicines and apparatus bought by him for the commission was used in his private practice, but this was denied by Doctor Kingsley.

It goes without saying that the commission should not expend more than is required properly to administer the compensation law. How much is a proper amount for that purpose, we do not know, for the

record is silent thereon. We can imagine it depends upon many circumstances, not necessary to be recited here.

It is also found by the respondent that "the expenses of the commission have increased out of proportion to the increase of the business of the commission." In proof of this finding, counsel for respondent refer us to the annual reports of the commission for the years 1927 to and including 1932 and those since, contending that the latter show the expenses of the commission have increased and thereby reduced the amount available to workmen. That fact, if granted, however, is no evidence of inefficiency, neglect of duty, malfeasance, misfeasance or nonfeasance in office. If increases in expenses were grounds of removal, we apprehend nearly every officer of the state could be removed, perhaps at times even a governor. Added duties, added expenses, increases in salaries, etc., may well account for increase of expenses, and such increase, though it be out of proportion to the increase in work, is no evidence of wrongful or unlawful action.

The respondent found that the commission in 1935 (before Lockhart or Houston became members) paid one Wm. R. Sneed $3,613.23 compensation for injuries and charged the award against the liability policy of the Goetz Ice Company, although its files and investigators' reports showed Sneed was not an employee of the ice company, or an employee of any employer insured in the state compensation fund, but was an employee of an uninsured independent contractor, and that he was hurt while gratuitously assisting employees of the Tracy-Holmes Fruit Company. This is the only finding made by respondent that in any way reflects upon the honesty and integrity of petitioner Holmes and, although it seems to include Lockhart, the fact is he was not a member

when the award was made. At the time, Holmes' associate commissioners were J. Ney Miles and Howard Keener. It appears that some of the preliminary investigations into Sneed's claim pointed in the direction of the finding. One investigator reported to the commission that Sneed was an employee of an uninsured independent contractor, and if he was, of course he was not entitled to an award under the compensation law.

The question of compensation was not decided upon the preliminary reports of investigators. Sneed employed an attorney and a formal hearing was had at which the testimony of six witnesses was taken and upon this testimony and other matters in the record the award was made. What this evidence was we do not know since it is not before us, nor was it before the respondent. There was no dissent to the award and the Goetz Ice Company did not appeal. We think the award of the commission, based upon the whole record including the testimony, should be accepted as correct rather than the preliminary reports of investigators, which may or may not turn out to be right upon the final hearing.

Unless there is some evidence showing the petitioners to be guilty of inefficiency, neglect of duty, malfeasance, misfeasance or nonfeasance in office, and we have been directed to none, the respondent had no power or jurisdiction to remove the petitioners.

This is not a parallel case to *Sims* v. *Moeur, supra.* In that case Governor Moeur personally preferred the charges against the defendant-commissioners. These charges were specific and direct. They were, that the commissioners had wilfully and wrongfully spent large sums from the compensation fund (1) to enjoin the submission of an initiated measure to the voters at the general election to be held in November, 1932, and (2) in advertising in newspapers

and otherwise trying to influence the voters, and (3) for failure to make annual reports for the years 1931 and 1932. The evidence was conclusive that the commissioners expended for the purposes named over $16,000 of the compensation fund. This was a clear misappropriation of the funds. The annual reports for 1931 and 1932 did not conform with the law, but we held that such nonconformity was not a cause for removal. What we thought then was that violations of the law, such as misappropriating the compensation funds, were grounds for removal, but that mere omissions or irregularities were not sufficient grounds for removal. We still believe that is the correct rule.

We think the order of removal should be annulled, and it is so ordered.

LOCKWOOD, C. J., and McALISTER, J., concur.