CITY OF BRIDGEPORT ET AL. *v.* NATHAN G. AGOSTINELLI,
COMPTROLLER, STATE OF CONNECTICUT

THE CONNECTICUT EDUCATION ASSOCIATION, INC. *v.*
THOMAS J. MESKILL, GOVERNOR, STATE OF
CONNECTICUT, ET AL.

HOUSE, C. J., RYAN, SHAPIRO, LOISELLE and MACDONALD, JS.

Argued June 14—decided July 27, 1972

*George C. Hastings,* with whom was *S. Frank D'Ercole,* for the plaintiffs in the first case.

*Jerome E. Caplan,* for the plaintiff in the second case.

*Raymond J. Cannon,* assistant attorney general, with whom were *Richard M. Sheridan,* assistant attorney general, and, on the brief, *Robert K. Killian,* attorney general, for the defendant in each case.

RYAN, J. These two cases seeking declaratory judgments and ancillary injunctive relief were combined by the Superior Court for the purpose of trial and then reserved for the advice of this court on a stipulation of facts. The first case was brought against the comptroller of the state by the cities and towns of Bridgeport, Danbury, New Haven and Norwalk, the towns of East Hartford, Hamden and Wallingford and the Connecticut Conference of Mayors, an association having an office in the city of New Haven. In the second case the plaintiffs are The Connecticut Education Association, Inc., of Hartford, Raymond W. Rossomando of Trumbull and James E. Burke of the town of Bristol. The defendants are the governor, the comptroller and the secretary of the state board of education.

This case was presented on a stipulation of facts dated May 4, 1972.

By virtue of Special Act No. 1 of the June special session of 1971, the General Assembly appropriated certain sums for payments to local governments for educational purposes including the following: Aid to industrial arts under the provisions of § 10-96 of the General Statutes; assistance to towns for educational purposes based on average daily membership of pupils (hereinafter referred to as the ADM grants) under § 10-262 of the General Statutes; educational programs for disadvantaged children under §§ 10-266a and 10-266b of the General Statutes; and adult education under § 10-71 of the General Statutes. Appropriations of funds were made as tax relief grants to municipalities as provided in §§ 8-159a and 10-266k of the General Statutes together with an appropriation of $15 per student in average daily membership as defined in § 10-261 of the General Statutes.

It was stipulated that the defendants intended to pay the full amount of each appropriation if the actual revenues of the state should be sufficient to permit full payment of all appropriations without incurring a deficit at the end of the fiscal year (June 30, 1972). To avoid a deficit, however, it was the intention of the governor to modify the allotments relating to the aforementioned appropriations and this may result in payment to the towns and cities of less than the full amount of their share of each appropriation. Based on known revenues from July 1, 1971, to May 4, 1972, and the revised estimates of the tax revenues from this date to the end of the current fiscal year, full payment of the appropriations in issue here will probably result in a deficit.

The following table shows the actual sums appropriated for the items involved in this case and the amounts actually paid out on each as of May 4, 1972:

| Appropriation and Statutory Reference: | Amount of Appropriation: | Amount paid as of May 4, 1972: |
|---|---|---|
| Aid to Industrial Arts (§ 10-96) | $ 437,500 | $ 111,392 |
| ADM Grants (§ 10-262) | 140,700,000 | 137,617,410 |
| Educational Programs for Disadvantaged Children (§§ 10-266a and 10-266b) | 8,500,000 | 6,084,496 |
| Adult Education (§ 10-71) | 415,000 | 332,173 |
| Grants under § 8-159a | 7,150,000 | 3,500,000 |
| Grants under § 10-266k | 4,500,000 | 2,500,000 |
| Grants of $15 per student in average daily membership | 10,050,000 | 3,320,745 |

Some of the plaintiff towns included as revenue estimates in their respective budgets a sum representing their share of these state payments based on the governor's recommended budget. Other towns estimated the revenue that would be received from the state in amounts exceeding their share based on the governor's recommendations, and in some instances these estimates corresponded to the

amounts receivable under the appropriations act as finally passed. All of the plaintiff towns adopted their budgets after the governor's budget message on February 16, 1971, and prior to the enactment of the appropriations act on July 1, 1971.

During oral argument, the defendants informed this court that the ADM grants under § 10-262 and the tax relief grants to municipalities under §§ 8-159a and 10-266k are in the process of being paid and will be paid in full, prior to the end of the fiscal year (June 30, 1972). This court has since been informed by counsel for the defendants, with the consent of the plaintiffs' counsel, that by letter dated July 7, 1972, the commissioner of finance and control announced that the following grants were paid in full before the fiscal year ended on June 30, 1972: Assistance to towns for educational purposes under § 10-262 ($210 ADM) and the tax relief grants to municipalities under §§ 8-159a, 10-266k and 10-261 ($15 grant on ADM formula).

The questions reserved for our advice are as follows: (1) If actual state revenues are insufficient to permit full payment of all the appropriations involved in these cases, may the governor, under the authority of § 4-85 of the General Statutes, modify allotments to the plaintiff towns thereby resulting in payments to these towns of lesser amounts than they otherwise would be entitled to receive from the full sums appropriated in Special Act No. 1 of the June special session of the 1971 General Assembly? (2) As long as the appropriation has not already been paid in full, is the comptroller required to pay to the plaintiff towns the amounts which they otherwise would be entitled to receive under each of the appropriations involved herein, even if the governor may modify allotments of such appropriations? (3)

May a plaintiff town which has included in its budget a revenue estimate no greater than its proportionate share of the sum presented in the governor's recommended budget nevertheless receive a sum based on the amount appropriated by the legislature in Special Act No. 1 of the June special session of the 1971 General Assembly for the items at issue in this litigation?

The questions presented in these cases arose out of the financial crisis faced by the state. The existence of this crisis was recognized by the General Assembly in a legislative finding in § 14 of No. 1 of the Special Acts of the June 1971 special session (the appropriations act), in the following language: "The state of the economy in Connecticut and elsewhere is one of severe stringency. . . . Considering a current state operating deficit of $260 million, and welfare costs approaching half a billion, a fiscal crisis of inordinate proportion must be met." This was recognized by the legislature in the revenue act, Public Act No. 8 of the June 1971 special session, § 96 of which provides as follows: "The appropriations for the expenses of the state in sections 1 and 2 of number 1 of the special acts of the current session may be reduced by the governor in an amount equivalent to not more than five per cent thereof and the total of the appropriations in said act to each agency may be reduced by an amount equivalent to not more than five per cent of such total appropriations; provided, however, that any such reduction shall be based on the total departmental or agency appropriation less the total of the grants hereinafter excepted from reduction within said departmental or agency appropriation. Provisions of the general statutes, as amended, or special acts of Connecticut to the contrary notwithstanding, this reduction may

be applied to any appropriation enumerated in said special act, except for amounts payable to towns under section 10-262 of the 1969 supplement [sic], as amended by section 13 of number 1 of the special acts of the current session, grants to municipalities as provided in section 8-159a of said supplement [sic], grants for special educational programs or services as provided in section 10-266k of said supplement [sic], and appropriations made to the state treasurer for debt service and other grants payable to towns entitled 'Payment to Local Governments.' "

The defendants urge that this is a clear indication that the legislature believed that state revenues probably would prove inadequate to pay all appropriations in full. Certainly the granting to the governor of this extraordinary power, unprecedented in Connecticut insofar as we have been able to determine,[1] would seem to support this view.

Fundamental to our system of government is the principle of the separation of powers. "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Conn. Const., art. 2. See *Adams* v. *Rubinow,* 157 Conn. 151, 251 A.2d 49, for an historical discussion of this provision. Accordingly, the constitution vests the legislative power of this state exclusively in the General Assembly. Conn. Const., art. 3, § 1; *Adams* v. *Rubinow,* supra; *Patterson* v. *Dempsey,* 152 Conn. 431, 442, 207 A.2d 734. "In the field of legislation, the legislature is supreme." *State* v. *Malm,* 143 Conn.

---

[1] The parties have raised no question concerning the granting of this power to the governor and we do not discuss it.

462, 467, 123 A.2d 276; see also *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 133, 32 A.2d 547; *Allyn's Appeal,* 81 Conn. 534, 536, 71 A. 794.

The power to legislate, which our constitution has committed solely to the General Assembly, necessarily includes the power to appropriate funds to finance the operation of the state and its programs. See General Statutes § 2-33. As defined in § 4-69 of the General Statutes, an appropriation is an authorization by the General Assembly to make expenditures and incur liabilities for specific purposes. Cf. *Woodward* v. *Reynolds,* 58 Conn. 486, 490, 19 A. 511.

In order to answer the questions reserved for our decision we must determine the intent of the legislature as expressed in the statutes for the purpose and fulfillment of which the appropriations in question were made.

Section 10-96 directs the state board of education to establish standards and regulations under which towns shall receive grants-in-aid for vocational schools and industrial art programs. Section 10-262 provides that during each school year each town or school district maintaining schools according to law during the preceding school year shall be paid by the comptroller on the certification of the secretary of the state board of education, $210 per pupil in average daily membership. Sections 10-266a and 10-266b provide for grants to towns for special programs for educationally deprived children. Section 10-71 provides for reimbursement of local boards of education for adult education in accordance with a procedure whereby the local board certifies to the state board of education the aggregate number of pupil clock hours of attendance at adult classes, and the "state board shall request the comp-

troller to draw his order on the treasurer in favor of such town board for the sum of twelve cents for each pupil clock hour so certified." Section 8-159a provides that "[d]uring each fiscal year the comptroller shall pay to each municipality for its unrestricted use a grant-in-aid to assist it in meeting its urban problems. Payment of such grant shall be made in March of each year." The appropriation for such grants is based on a three-part formula involving each municipality's population, its density and the number of public housing rooms in the municipality. Under § 10-266k an appropriation is made to assist municipalities in providing special educational programs or services designed to improve or accelerate the education of educationally deprived children and those requiring special education and for other municipal purposes. It contains a formula for determining the amount which any municipality shall receive and provides that the amount due each municipality each year shall be paid one-third in October, one-third in January and one-third in April. The appropriation for grants to municipalities in the amount of $15 per student in average daily membership as defined in § 10-261 of the General Statutes was made for the first time by the General Assembly in 1971 and there is no statute providing for this payment. Obviously it is effective for one year only.

These statutes are grants to municipalities for educational purposes and for tax relief. In some of the statutes, the legislature has actually employed the word "grant" to characterize the payment which is to be made. In others, where no specific characterization is used, the making of the payment is made mandatory. Both methods achieve the identical effect. The General Assembly has determined

that the interests of the state will best be served by making grants of financial aid to the towns and cities which meet the requirements of the statutes. The legislature has made payment of this aid an obligation of the state and has appropriated the items in question in fulfillment of the duty so created.

In such a situation, the role of the comptroller is constitutionally circumscribed. "The comptroller shall adjust and settle all public accounts and demands, except grants and orders of the general assembly." Conn. Const., art. 4, § 24. As to such grants, the comptroller has only to perform the ministerial act required of him. Where, as here, the law fixes definitely the amount of any claim, the time and manner of its payment and the person to whom it is due, and the claim is duly presented to the comptroller, he has no discretion to exercise, no judgment to use, and no duty to perform but to draw his order in payment of it. *State* v. *Staub*, 61 Conn. 553, 569, 23 A. 924; see also *Dowe* v. *Egan*, 133 Conn. 112, 127, 48 A.2d 735.

The defendants urge that the governor has the power to reduce the payments to the towns from the amount they would otherwise be entitled to receive. The constitution vests in the governor the supreme executive power of the state. Conn. Const., art. 4, § 5. The courts have held, however, that such a provision vests little or no inherent power in the governor. *Holmes* v. *Osborn*, 57 Ariz. 522, 115 P.2d 775; *Field* v. *People*, 3 Ill. 79; *Royster* v. *Brock*, 258 Ky. 146, 79 S.W.2d 707; *Richardson* v. *Young*, 122 Tenn. 471, 125 S.W. 664; *Ex parte Holmes*, 12 Vt. 631; 81 C.J.S., States, § 60; cf. *Patterson* v. *Dempsey*, 152 Conn. 431, 207 A.2d 739. The governor is authorized to see that the laws are faithfully exe-

cuted, but the remainder of the governor's authority must be found in other constitutional provisions and in the statutes. Id.

The defendants claim that the governor has the power to modify the allotments of budgeted agencies by virtue of § 4-85, which statute was not in existence at the time of the *Staub* case, and that this permits him to reduce the allotments to towns concerning the grants in question. The plaintiffs take the position that § 96 of the revenue act is a later act and is inconsistent with the powers claimed for the governor under § 4-85 in that it expressly excepts from its operation any reduction of appropriations concerning the grants in question. Section 96 deals with appropriations. "Appropriation" is defined in § 4-69 (4) of the General Statutes as follows: "[A]n authorization by the general assembly to make expenditures and incur liabilities for specific purposes." Section 4-85 is concerned with the modification by the governor of the allotments, defined in § 4-69 (3) as follows: " 'Allotment' means a portion of an appropriation or special fund set aside to cover expenditures and encumbrances for a certain period or purpose." Obviously the statutes deal with different subjects. There is no conflict between the two statutes. In any event the governor did not reduce the appropriations which were excepted in § 96 of the revenue act, although he did reduce other appropriations in accordance with its terms.

Section 4-85 provides, in pertinent part, as follows: "Before an appropriation for administration, operation and maintenance of any budgeted agency becomes available for expenditure, each budgeted agency shall submit to the governor through the director of the budget, not less than twenty days

before the beginning of the fiscal year for which such appropriation was made, a requisition for the allotment of the amount estimated to be necessary to carry on the work of such budgeted agency during each quarter of such fiscal year. . . . The governor shall approve such requisitions for allotments, unless he determines that the estimated budget resources during such fiscal year will be insufficient to pay all appropriations in full, in which event he may modify such allotments to the extent he deems necessary to prevent or avoid a deficit in any or all of the several funds of the state at the end of such fiscal year."

This statute and its companion statutes in chapter 50 of the General Statutes were enacted to give the governor the power to supervise the execution of the budget. See Report of the Connecticut Commission Concerning the Reorganization of the State Departments (1935), p. 154. Prior to 1937 a state agency's ability to spend was limited only by the amount and purpose of the appropriations made. The full amount of the appropriation was reserved for the use of the agency in blanket fashion. Only when a given appropriation proved inadequate did the board of finance and control exercise any control. Ibid. The report decried the fact that the state had no systematic procedure for controlling the rate or the timeliness of expenditures. Some agencies apparently exhausted their appropriations long before the end of the fiscal year, creating the need for deficiency appropriations. To remedy this situation, the commissioners proposed a plan through which the appropriations would be made available to the state agencies under a system of quarterly allotments to be administered by the governor. He was to control the timeliness and the amounts of the allotments de-

pending on the state of the revenues received. The allotments so made would establish the maximum amount to which an appropriation could be encumbered. These recommendations provided the basis for what is now part of chapter 50 of the General Statutes. See § 52e of the 1937 Supplement to the 1930 Revision.

The governor's statutory power to modify allotments, however, extends only to appropriations for the administration, operation and maintenance of a "budgeted state agency." This term is defined in § 4-69 (11). It means: "(a) [E]very department, board, council, commission, institution or other agency of the executive department of the state government . . . ; (b) every court, council, division and other agency of the judicial branch of the state government . . . ; (c) every full-time permanent department or agency of the legislative branch of the state government; and (d) every public and private institution, organization, association or other agency receiving financial aid from the state."

Subsection (a) of § 4-69 (11) refers to departments and agencies of the executive department of the state government. Subsection (b) embraces the judicial department. Subsection (c) refers to the legislative department. Subsection (d), in referring to "every public and private institution, organization, association or other agency receiving financial aid from the state," contains broad language and covers a large number of institutions such as hospitals and numerous other state agencies, boards and commissions to which the state gives financial aid. "Town," "city" and "municipality" are terms used throughout the General Statutes. If the legislature had intended that towns should be "budgeted agen-

cies" it could have said so. The fact that it did not do so is a clear indication that the omission was intentional.

A town or city is a political subdivision of the state. *State ex rel. Maisano* v. *Mitchell,* 155 Conn. 256, 263, 231 A.2d 539. It is not an agency of the state and certainly does not come within the definition of "budgeted state agency." The defendants recognize this and do not claim that each town is a budgeted state agency. They do claim, however, that the state board of education and the office of the state comptroller are budgeted state agencies. This is unquestionably true. It is clear, however, that in the present case they act as mere agents of the legislature for the purpose of payment. As we noted earlier, the appropriations involve grants to the towns, and the legislature has ordered the comptroller to perform the ministerial act of payment. The role of the state board of education is one of setting standards and certifying eligibility. It is clear, moreover, that the appropriations in question are not used to pay the salaries of the personnel in the comptroller's office or in the office of the state board of education. They are not to be spent for the purchase of equipment and supplies for those offices. They are not funds for the administration, operation and maintenance of those agencies, and, accordingly, are not subject to the governor's power to modify allotments.

The defendants make the further claim that local boards of education are budgeted state agencies within the ambit of § 4-85. We find no merit in this contention. It is true that education is a state function and duty and that local boards act as agents of the state for the purpose of providing education in the town or city. *West Hartford Edu-*

*cation Assn.* v. *DeCourcy,* 162 Conn. 566, 573, 295 A.2d 526. The financing of education, however, is a fundamental responsibility of the municipality. *Waterbury Teachers Assn.* v. *Furlong,* 162 Conn. 390, 394–95, 294 A.2d 546. Section 10-222 of the General Statutes provides that the board of education in each town shall prepare an itemized estimate of the cost of maintenance of public schools and submit it to the board of finance, or other similar body, two months before the annual meeting at which appropriations are to be made. We have held that under this statute the town board of finance may control the total amount of appropriations for the board of education, subject to certain limitations. *Waterbury Teachers Assn.* v. *Furlong,* supra, 397–98; *Board of Education* v. *Ellington,* 151 Conn. 1, 193 A.2d 466. Section 10-222 and chapter 50 of the General Statutes have separate and distinct fields of operation. The budget-making process with which local boards of education must deal is in the town as provided in § 10-222. Chapter 50 does not apply to local school boards. A town board of education does not submit a budget estimate to the state and is not required to submit to the governor through the director of the budget a requisition for an allotment under the provisions of § 4-85. A local board of education is not a budgeted state agency.

We have reached the following conclusions: Question 1. Section 4-85 does not authorize the governor to modify allotments to the plaintiff towns thereby resulting in payments to them in lesser amounts than they would be entitled to receive from the sums appropriated in Special Act No. 1 of the June special session of 1971, subject, however, to their compliance with the provisions of the applicable statutes previously discussed.

Question 2. The comptroller is required to pay to the plaintiff towns the amounts which they otherwise would be entitled to receive under each of these appropriations, subject, however, to their compliance with the provisions of the applicable statutes previously discussed.

Question 3. The revenue estimate in the budget of any plaintiff town and its size in relation to the governor's recommended budget are of no consequence and need not be considered. Each town is entitled to receive a sum based on the appropriations in question subject to compliance with the provisions of the applicable statutes previously referred to.

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.