[Civil No. 3322.    Filed March 6, 1933.]

[19 Pac. (2d) 679.]

ROBERT B. SIMS, CHARLES W. HARTMAN and WILLIAM E. HUNTER, Members of the Industrial Commission of Arizona, Petitioners, v. BENJAMIN B. MOEUR, as Governor of the State of Arizona, Respondent.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Petitioners.

Mr. Arthur T. La Prade, Attorney General, and Mr. Charles L. Strouss, Assistant Attorney General, for Respondent.

ROSS, C. J.—This is an original proceeding commenced by petitioners, Robert B. Sims, Charles W. Hartman, and William E. Hunter, to obtain a review of an order by the Honorable Benjamin B. Moeur, Governor of the state of Arizona, removing them from their offices as members of the industrial commission of Arizona.

Petitioners were appointed by Governor Moeur's predecessor by and with the advice and consent of the state senate, for terms of six years, and their terms had not expired when the order of removal was made.

Governor Moeur was inducted into office on the first Monday in January, 1933, and on the 11th of that month he served written charges on the petitioners in which he accused them: (1) Of having wilfully and wrongfully and without authority of law expended money from the state compensation fund, in instituting and prosecuting an action in the superior court of Maricopa county, entitled *R. B. Sims* v. *Scott White, as Secretary of State of Arizona,* for the purpose of prohibiting said secretary from placing on the official ballot for the general election held in November, 1932, a certain initiated measure proposing to repeal the Workmen's Compensation Law; (2) of having wilfully and wrongfully and without

authority of law expended money from said compensation fund in newspaper advertising, radio broadcasting, printing and distributing circulars and letters, and in the employment of persons for the purpose of influencing the vote of the electors on said initiated measure; and (3) of having failed and neglected to make annual reports, for the years 1931 and 1932, to the Governor of the state as provided by law.

Thereafter, and on January 23d, the day fixed by the Governor for a hearing on said charges, the petitioners appeared before him in person and were represented by counsel, the Governor being represented by the Attorney General, whereupon evidence was introduced by both sides in support of and against said charges.

Thereafter and on the thirty-first day of January, 1933, the Governor made his findings and order and therein held that all of the above charges were sustained and ordered their removal. He also found the petitioners guilty of other official derelictions and misconduct, but inasmuch as they were not in the formal charges we shall not consider them. The petitioners have brought the proceedings and the order of removal here for review.

In response to the order to show cause the respondent has made his return, and it appears therefrom that the people of Arizona, in the summer of 1932, within the time allowed by law, filed with the Secretary of State an initiated measure proposing to repeal article 5, chapter 24, sections 1391–1457, Revised Code of 1928 (the Workmen's Compensation Law), and to provide for the liquidation of its affairs. That thereafter R. B. Sims, one of the petitioners, in his private capacity, commenced an action in the superior court of Maricopa county, entitled as above, to enjoin and prohibit the Secretary of State from

placing on the official ballot at the November election said proposed initiated measure. That the petitioners employed attorneys to bring and prosecute said proceeding; employed, in preparation for a trial of said cause, numerous persons to find evidence of fraud alleged to have been practiced in securing names to said initiated measure by the circulators thereof, to show that many signers of such petition were not qualified voters, that signatures thereto were forgeries, etc.; caused to be printed and distributed to the voters throughout the state extensive propaganda against the measure; employed numerous persons to make speeches against it over the radio and elsewhere; paid personal workers to go among the voters and oppose the repeal measure; inserted in many newspapers of the state articles praising the compensation law and criticising the effort to repeal it; and paid all the expenses thereof, amounting to the sum of $16,326.60, out of the state compensation fund, segregated as follows: $4,358.50 for attorneys' fees, costs, clerical hire, etc., in the matter of the prosecution of the lawsuit, and the balance for stamps in mailing propaganda to voters, for newspaper advertising, radio broadcasting, printing and distributing circulars and letters, and in the employment of a great number of persons to electioneer against said initiated measure.

These ultimate facts are not in controversy and their statement is sufficient in our opinion to present the questions of law involved, and for that reason we do not set forth the details of the evidence or the full return to the writ. We will, however, have occasion to refer to the evidence as we proceed.

The petitioners' claims of error sufficiently indicate their defense. They are: (1) That since they were appointed by and with the advice and consent of the senate for fixed terms, they cannot be removed dur-

ing their terms without the advice and consent of that body; (2) that the power of removal conferred on the Governor is unconstitutional, because it is not embraced or expressed in the title of the compensation act by which such power is attempted to be conferred; (3) that they were lawfully within their rights and powers in making such expenditures from the state compensation fund; (4) that the Governor acted arbitrarily and capriciously and without legal evidence to support his charges; and (5) that the evidence shows that the petitioners made the annual reports to the Governor as provided in section 1450 of the Revised Code. We will consider these questions in the order given above.

The section of the compensation act (1391) which provides that the members of the industrial commission shall be appointed by the Governor by and with the advice and consent of the senate also contains this provision: "The governor may remove any member of the commission for inefficiency, neglect of duty, malfeasance, misfeasance, or nonfeasance in office." This provision does not in any way conflict with the state Constitution. That instrument is silent as to the power of removal from office, and in such case it is left with the legislature to regulate it by statute. The manner of appointment of the commissioners, as well as the manner of their removal, is peculiarly a legislative matter. If the legislature see fit to require the advice and consent of the senate to an appointment it may do so, and it could likewise require the advice and consent of that body to the removal, but it has not. That the legislature exercised a rightful power in making this distinction cannot be questioned. The power to remove for any of the causes mentioned is vested solely in the Governor of the state.

The ' title to the compensation act as originally passed (chapter 83, Laws 1925) is very comprehensive. However, it does not specifically mention the appointment or the removal of the commissioners. It does express as one of its subjects the creation of a commission, its powers and duties. In the body of the act there is a provision for the appointment of the commissioners, their terms of office, their compensation and various duties, also for their removal for cause. Clearly the matters of appointment and removal of such officers are germane to the subject of the act as expressed in the title. The appointment and removal of the commissioners were properly connected with the subject of the act. *Skaggs* v. *State,* 24 Ariz. 191, 207 Pac. 877; *Board of Control* v. *Buckstegge,* 18 Ariz. 277, 158 Pac. 837; *Hancock* v. *State,* 31 Ariz. 389, 254 Pac. 225; *Black & White Taxicab Co.* v. *Standard Oil Co.,* 25 Ariz. 381, 218 Pac. 139.

The petitioners admit spending from the state compensation fund more than $16,000 to lawyers for bringing the suit to enjoin the placing of the initiated measure of the ballot and in influencing the voters against the measure. They justify such expenditure upon the following grounds: (1) They say the compensation law authorized the expenditure; (2) that they were influenced in making such expenditure by the requests of many employers insured in said fund; and (3) that there was in such fund some $3,500,000 and that if said initiated measure should be approved by the people and the compensation fund liquidated, as in said measure provided, it would result in a loss to the fund of some $900,000, since said fund consists of state, county, and municipal bonds, the present market value of which is greatly depressed.

Whatever the motive of this proposed legislation by the people, it must be confessed that it inadequately protected the compensation fund and took away all future protection from the employer and employee. It is fundamental, however, that neither the courts nor the citizens can question the motive of legislators or of the people exercising their right to make laws. The creation of the compensation law and the compensation fund therein was legislative. That department could destroy its creature if it so chose, and the fact that the accumulated reserve in the compensation fund might have been lost, or greatly reduced, would not prevent that department exercising its legislative powers.

Granting the eventuality suggested and that the compensation fund, if the measure carried, could not have been protected on a proper application to the courts, still the right of the people to unmake laws, however destructive or ill-advised, is unquestioned, and if such act contravene the federal or state Constitution the remedy arises after its passage. The petitioners' right to expend compensation money, therefore, cannot be justified on the ground that the initiated measure proposed to abolish their offices and the compensation law. If that right exists at all, it must be found in the statutes defining the powers and duties of the commission in relation to the compensation fund. It should be stated that R. B. Sims had an undoubted right to bring and prosecute the action against the Secretary of State to test the legality and sufficiency of the initiated measure, and to ask for a restraining order pending the determination of that issue [section 1744, Rev. Code 1928; *Barth* v. *White,* 40 Ariz. 548, 14 Pac. (2d) 743], but at his own expense. The industrial commissioners, as such, had no more interest in that action than any other state agency and no more right,

abstractly speaking, to spend money entrusted to them for other purposes to prosecute said action, than would the members of the state tax commission or the state corporation commission to expend money in their possession or control to save their offices. It must be remembered that the commission is a creature of statutory origin and that it can do only those things or exercise those powers that are expressly conferred or necessarily implied in the law.

The Workmen's Compensation Law, broadly speaking, is a legislative scheme by and through which the employer of labor may have relief from statutory and common law actions for damages; and the employee, and his dependents in case of death, may be secured compensation or death benefits, to be borne by industry; or where the employer is the state, a county, city, town, municipal corporation, or school district, by such units. What constitutes the state compensation fund and the commissioners' duties and powers in connection therewith are defined by section 1410, as follows:

"There is hereby created a fund, to be known as the state compensation fund, for the purpose of insuring employers against liability for compensation, and of assuring to the persons entitled thereto the compensation herein provided. Such fund shall consist of all premiums and penalties received and paid into the fund, or property and securities acquired by and through the use of money belonging to the fund, and of interest earned upon money belonging to the fund. Such fund shall be administered by the commission without liability of the state beyond the payment of losses sustained on account of such fund, and shall be applied to insurance and to the payment of compensation and of expenses as herein provided. The commission shall have full authority over the fund, and may do all things necessary or convenient in the administration thereof, or in connection with the compensation business to be carried on by it hereunder, and shall adopt rules and regulations for the

collection, maintenance and disbursement of the fund.''

Part of such fund is made up from premiums paid into the commission by corporations, associations and individuals, the amount thereof being determined and fixed by the commission (section 1427), and part by the state and its political subdivisions whose mandatory duty it is to insure their employees in such fund and pay premiums to the commission based upon their pay-rolls (section 1425).

In the assumption by the state of jurisdiction and control of the liability of the employer and the compensation of the employee by means of social insurance, a function formerly regarded as of private concern only, it is obvious that it was necessary for the state to constitute or appoint some agency, under such rules and regulations as it might prescribe, to supervise and administer the duty thus assumed. The plan adopted assimilates the ordinary liability insurance. The commissioners occupy, with reference to the compensation fund and its administration, a position in many ways analogous to that of a board of directors, and the policy-holders that of stockholders except they have no voice in the management. The premiums are fixed and collected by the commission and forthwith paid to the treasurer as custodian for safekeeping, and these funds can be paid out only on vouchers authorized by the commission and signed by a member and the secretary thereof (section 1416). The surplus or reserve of the fund may be invested by the commission in bonds of the United States or federal land banks, of the state, or of any county, city, town or school district of the state, at current market prices (section 1417). The fund is primarily for the benefit of the employees, who likewise have no voice in its management. This fund the law intends shall be sacredly and carefully pro-

tected and conserved. The relation of the commission to the fund is one of peculiar confidence and trust. The commission may not use the fund for any purpose other than expressed or necessarily implied in the act creating the fund; for instance, while the fund is primarily for the employee, the commission cannot compensate him, or his dependents if he is killed, unless he sustains an injury by accident arising out of and in the course of his employment; and the burden is on the employee to show the commission that his injury is compensable. It is made the commission's duty to hear the evidence and judicially determine whether the employee should be awarded compensation. The large number of cases that have been brought to this court to review awards by the commission is, we think, conclusive evidence that the commissioners knew, even in taking care of the injured or crippled employee or his dependents, the law cannot be disregarded. They were advised from our decision in *Industrial Commission* v. *Arizona Power Co.*, 37 Ariz. 425, 295 Pac. 305, that the form of policy that they may issue must be one provided by the act and that they have no right thereunder to issue a self-rating policy. In that case we said:

"The commission is an agency of the state, created and maintained for the purpose of administering certain of the state's sovereign powers, and must proceed and act according to legislative authority as expressed or necessarily implied."

The commission is limited, not only in the granting of awards and forms of policy issued, but in the matter of the expense in administering the compensation fund. Section 1395 provides:

"The commission may employ actuaries, accountants, inspectors, examiners, experts, clerks, physicians and other assistants, and fix their compensation. Such

employment and their compensation shall be first approved by the governor, and together with necessary traveling expenses allowed by the commission, shall be paid out of the state compensation fund. The members of the commission and the secretary shall receive their salaries and actual and necessary expenses while traveling on the business of the commission, to be paid by the state.''

It will be noticed that the legislature generously exempted the compensation fund from the payment of the salaries and necessary expenses of the commissioners and the secretary while traveling on commission business and placed that burden on the state. The character of the employees the commission may appoint and fix compensation for, having first obtained the approval of the Governor, such as actuaries, accountants, inspectors, examiners, experts, physicians and other assistants, is conclusive evidence that the employment is in connection with administering the compensation fund—actuaries to determine the proper and fair rate of premiums, physicians to aid the commission in determining the extent of injuries to employees. The association of the other employments with these two is most convincing evidence that the services of all these employees were to be in aid of the administration of the compensation fund. The salaries and expenses of such employees are charges against that fund, made so either expressly or by necessary implication.

It may be asked, then: What provisions of the law do the petitioners claim gave them authority to use the compensation fund to pay lawyers to prosecute said action against the Secretary of State and to enter upon a state-wide campaign to defeat the initiated measure, employing all the tricks and wiles common to heated political contests? The petitioners say the last sentence of section 1410, *supra,* is broad and general enough, when liberally construed, to give

them authority. That sentence reads: ''The commission shall have full authority over the fund, and may do all things necessary or convenient in the administration thereof, or in connection with the compensation business to be carried on by it hereunder, and shall adopt rules and regulations for the collection, maintenance and disbursement of the fund.'' This sentence is quite specific when construed in connection with the whole act, as it must be if we would get from it what the legislature intended. It is a limitation of the power of the commissioners and of their expenditures to a liberal, fair and honest administration of the compensation fund for the purpose for which it was created. The sentence preceding the one above quoted puts the whole matter in a nutshell:

''Such fund shall be administered by the commission . . . and shall be applied to insurance and to the payment of compensation and of expenses as herein provided.''

Petitioners also select from section 1397, granting general powers to the commission, the following language: ''to collect, collate and publish all statistical and other information relating to employees, employers, employments, and places of employment, with such other statistics as it deems proper'' and say that it justifies their participation in the campaign against the initiated measure, because it was of great concern to both employees and employers as to whether the compensation act should be abolished or preserved. Not only the language itself, but the context from which it is taken, refutes petitioners' contention. The activities of the commission therein specified are all directed to the ''protection of life, health, safety and welfare of employees,'' and not to their political actions. Indeed, it is provided that ''no commissioner or any regular employee of the

commission shall serve on any committee of any political party'' (section 1391). This is a clear manifestation of the intention of the legislature that the commission should not dabble or mix in political controversies either as individuals or as a body.

It is not necessary to cite any authority other than the compensation act itself to show that the commission had no right to spend the compensation fund for lawyers' fees to prosecute the action against the Secretary of State, or to influence the electorate. However, we shall do so.

In *State* v. *Superior Court,* 93 Wash. 267, 160 Pac. 755, L. R. A. 1917B 354, the commissioners of the port of Seattle, a public corporation, were held not authorized to spend public funds to defeat an initiated measure proposing an amendment to the corporation's charter, under a contention of implied authority to do so. It was contended by the commissioners that the port of Seattle was engaged in commercial enterprises in competition with private individuals in similar enterprises and for that reason the commissioners had a right to spend its money in such way as they deemed for the best interests of the corporation; that they had the implied authority to do so. The court disallowed this contention and, among other things, said:

''The approval or rejection of the amendment proposed to the port of Seattle is a matter of no concern to the port itself, or its commissioners. As stated above, this corporation is a branch of the state government, municipal in its character, and its authority is limited to the powers expressly granted or necessarily inferred from express grants. If the port commissioners may take the money of the port, acquired by taxation upon property within the district or otherwise, for political purposes, or purposes other than those for which the port was organized, then there is no limit upon the port commissioners in expending the money of the port. The commis-

sioners might determine that the best interests of the business of the port required that the individual members of the commission be perpetuated in office, and, because of that reason, use the funds of the port to insure their own election. We are clearly of the opinion that, when the port was created, no thought was held by any person that the money raised by the port could be used for political purposes, or any purpose other than for the direct use of the port and its business.''

In *Mines* v. *Del Valle,* 201 Cal. 273, 257 Pac. 530, the board of public service commissioners, the controller of the public service department, the auditor and treasurer of the city of Los Angeles were adjudged liable in the suit of a private citizen and taxpayer of the city for moneys of the department paid out by them in carrying on a campaign for the purpose of influencing the voters of the city in favor of a proposed bond issue to enlarge the city's electric light plant, on the ground that the expenditure was not either expressly or impliedly authorized. It was said that good faith and honest intentions were no defense. On the unfairness of the use of a public fund contributed by those favoring and those opposing the initiated measure to influence the electorate to vote for it, the court's comment is very apposite:

''It must be conceded that the electors of said city opposing said bond issue had an equal right to and interest in the funds in said power fund as those who favored said bonds. To use said public funds to advocate the adoption of a proposition which was opposed by a large number of said electors would be manifestly unfair and unjust to the rights of said last-named electors, and the action of the board of public service commissioners in so doing cannot be sustained, unless the power to do so is given to said board in clear and unmistakable language.''

The commission, even in the employment of help to assist in the performance of duties clearly con-

ferred on it, must first obtain the approval of the Governor "of such employment and their compensation." We have held that this approval by the Governor is mandatory. In *Industrial Commission* v. *Price,* 37 Ariz. 245, 292 Pac. 1099, we said:

"It is the contention of the commission that this section [1395] contains no limitation upon its power to employ necessary help, or to fix their compensation. It is said the commission is the sole judge as to both, and that, if the Governor has any duty in that connection, it is only a ministerial duty. With all due deference to the contention, we cannot see it that way. It seems to us that the legislative intent is plain and clear that the Governor shall have a certain control or supervision of the number and necessity of employees employed by the commission and also of their compensation. We think the language is not susceptible of any other interpretation or construction than that the Governor must first approve, not only of the employment, but also of the compensation. . . .

"The evident legislative purpose in conferring upon the executive this power was to place a check upon the commission in the expenditure of the compensation fund for assistants and aids and to save as much thereof as possible for disabled workmen and their families."

The evidence shows that quite an army of persons was engaged by the commission, or by its regular attorney, in connection with the lawsuit and in the effort to defeat the initiated measure, and that Governor Hunt gave a verbal blanket approval of the employment of sixteen of such persons but not of the rest of them. In the first place, in our opinion such an approval is not the one contemplated by the statute. It is required that the proceedings of the commission shall be shown on its records (section 1394). It is hardly conceivable that if the commission honestly believed the law authorized such ex-

penditures it would not have made such a large outlay from the compensation fund a matter of public record and insisted upon the Governor's written approval of both the employment and the salaries or wages paid. But, if we accept the statement that the Governor verbally authorized the employment of such a numerous band for work so foreign to the administration of the compensation fund, still there is not an iota of evidence that he approved of the compensation paid them. So, irrespective of the purpose for which the fund was expended, it was unlawfully expended because the commission did not comply with the statute by first obtaining the Governor's approval of the employment and the compensation.

The derivation of funds generally fixes their character as private or public. In this instance the compensation fund is made up of money from taxation, such as the premiums paid by the state and its political subdivisions, and of moneys paid by industry as premiums. The statute, section 4734, Revised Code of 1928, defining crimes against the revenue and property of the state provides that:

"The phrase 'public money,' as used herein, includes all bonds and evidence of indebtedness, and all money belonging to, received, or held by, the state, county, district, city or town officers, in their official capacity."

Under this definition it is not the source of the money but its ownership, or the fact that it is received or held by officers of the state and its political subdivisions in their official character, that makes it "public money."

While for some purposes the compensation fund might well be held not to be "public money," in its relation to the commission, however, it is certainly "public money." And, whosesoever it is, it does not belong to the commissioners; it is not theirs, nor does

it belong to the insured. The policy-holders in such fund do not own it and have no right to dictate its expenditure. That right is conferred upon the state and its agent, the commission. Nor can the commissioners, because certain individual policy-holders requested the expenditure, justify their conduct. The fund can be expended only for the purposes for which it is created and in the manner and upon the terms prescribed by the compensation law.

The claim of right to spend the compensation fund for the purpose of influencing an election, or for lawyer's fees to prevent an election, comes as quite a shock.

Whatever else the record shows, it appears therefrom that the charges made by the Governor were well supported by the evidence, and that he was not actuated by arbitrary or capricious motives.

While the annual reports made to the Governor for 1931 and 1932 do not comply with the requirements of section 1450, we cannot say that their defectiveness is such neglect of duty or inefficiency as to be cause for removal. We will say, however, that we believe the commission should make such reports in detail, as therein required, so that the Governor and the public may be fully advised of the administration of the compensation fund.

We conclude that the record shows the petitioners are guilty both of inefficiency and of malfeasance in office. If, as they contend, they did not know they were violating the law, but thought they had a right to do as they did, they are not fit or qualified for the duties of their office; they are inefficient. "Malfeasance" is defined in 38 Corpus Juris 344, as follows: "Evil doing; ill conduct; the commission of some act which is positively unlawful; the doing of an act which is wholly wrongful and unlawful; the doing of an act which the person ought not to do at

all.'' The petitioners' conduct falls easily and well within this definition.

The order of removal is approved and affirmed.

LOCKWOOD and McALISTER, JJ., concur.