RICHARD L. ANDERSON & others[1] vs. CITY OF BOSTON & others.[2]

Suffolk. July 13, 1978. — August 23, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Municipal Corporations*, Expenditure to influence elections, Constitutional protection. *Elections. Constitutional Law*, Political contributions, Elections, Freedom of speech and press.

A municipality had no authority to appropriate funds for the purpose of taking action to influence the result of a referendum proposed to be submitted to the people at a State election. [183-188]

Discussion of legislation regulating the collection and expenditure of funds for election purposes. [185-188]

The First Amendment to the United States Constitution did not require that a city be authorized to appropriate funds to influence the result of a vote on a referendum proposal. [188-198]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on June 23, 1978.

The case was reported by *Wilkins*, J.

*Harold Hestnes (John G. Fabiano & Kenneth R. Berman* with him) for the plaintiffs.

---

[1] The other plaintiffs are George M. Burke, Donald G. Colony, Robert L. Hughes, Jr., Andrew A. Hunter, Arnold London, Frank Remick, Edward N. Wadsworth, Richard Wait, Thomas R. B. Wardell, and William M. Yates.

[2] The other named defendants are Kevin H. White, mayor of Boston; the nine members of the city council; James V. Young, collector-treasurer of the city and deputy mayor for fiscal affairs; James Hyde, first assistant collector-treasurer of the city; and John Weis, director of the Office of Public Information on Classification.

An appearance and an amended answer have been filed on behalf of all named defendants except four members of the city council. We shall refer to the defendants who joined in the amended answer as the defendants.

*Laurence H. Tribe* (*Harold J. Carroll*, Assistant Corporation Counsel, & *Herbert P. Gleason*, Corporation Counsel, with him) for City of Boston & others.

WILKINS, J. The plaintiffs, eleven taxable inhabitants of the city of Boston (city), seek a declaratory judgment pursuant to G. L. c. 231A, and equitable relief pursuant to G. L. c. 40, § 53, concerning the legality of certain actions contemplated by the city in support of a referendum proposal which will be presented to the people at the November, 1978, general election. The referendum proposal concerns an amendment (the classification amendment) to Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth which would authorize the Legislature to "classify real property according to its use in no more than four classes and to assess, rate and tax such property differently in the classes so established, but proportionately in the same class" and to grant reasonable exemptions. Currently, except for reasonable exemptions (*Assessors of W. Springfield* v. *Eastern States Exposition*, 326 Mass. 167, 170 [1950]), it is constitutionally impermissible for a municipality to assess various classes of real property disproportionately in relation to the properties' fair cash value. Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth. See *Weinstock* v. *Hull*, 367 Mass. 66, 69, appeal dismissed, 423 U.S. 805 (1975); *Opinion of the Justices*, 344 Mass. 766 (1962).

The complaint was filed in the Supreme Judicial Court for the county of Suffolk on June 23, 1978. A hearing was held on June 28, 1978, on the question of the issuance of a preliminary injunction. The defendants stipulated that they would not expend certain appropriated funds. A single justice reserved and reported the case for determination by the full court on the pleadings and a statement of agreed facts.

We summarize the material facts agreed to by the parties. On May 30, 1978, the mayor submitted a proposed ordinance to the city council (council), which the council passed by a five-to-four vote on June 7, 1978. That ordi-

nance authorized, subject to appropriation, the expenditure of city funds "for the purposes of providing educational materials and disseminating information urging the adoption by the people of a proposed amendment to the Massachusetts Constitution relating to the classification of property for purposes of taxation."[3] On May 31, 1978, the mayor submitted to the council an appropriation request for funds for the purpose of funding an "Office of Public Information on Classification." On June 7, 1978, again by a five-to-four vote, the council passed an order appropriating $975,000, to be raised by taxation (G. L. c. 59, § 23), for the expenses of the Office of Public Information on Classification.[4] The mayor approved the ordinance and the appropriation order on June 23.

The mayor has organized the Office of Public Information on Classification "for the purpose of collecting and disseminating information about the impact of 100% valuation on the residents of the City and on the potential of the classification amendment to mitigate that impact." That office would include in its information the fact that the city urges the voters to approve the classification question. It is encouraging the formation of a group of unpaid citizen volunteers to assist in the collection and dissemination of information concerning the classification amendment. The city intends to provide office space and telephones to the volunteers to enable them "to augment the City's efforts." The city will provide printed materials at its expense for distribution to the voters. Some city employees have volunteered to serve full time

[3] The ordinance forbids the use of any such funds for the promotion of any individual. No public official may have his name or picture "individually displayed on any so-called educational material."

[4] Of the amount appropriated, $475,000 is subject to further approval of the council before it may be expended. The appropriation order also states that "should a permanent injunction be granted to any parties contesting the legality of this appropriation, then any funds not encumbered or spent shall be returned immediately to the City Treasury."

on the staff of the office as part of their official duties. Others have volunteered to devote part of their time during regular city business hours aiding the operations of the office. The mayor initially requested city department heads to spend three hours each day "in this effort" in addition to their regular duties.

"Studies conducted by the City indicate that the implementation of 100% valuation in the City will effect a transfer of tax burden from commercial and industrial property to residential property in a gross amount of approximately $78,000,000. This transfer will practically double the tax burden on many single family homes in the City, increasing the tax on them by over $1,000." Other studies indicate that, "while many Boston voters understand the impact of 100% valuation on their taxes, few were acquainted with the Classification Amendment or had any idea of its possible impact in mitigating the effects of 100% valuation." There are persons and interests opposed to the passage of the classification amendment who will work to defeat it and who are raising funds from individuals and corporations for that purpose.

On June 30, 1978, the city paid an assessment of $112,-550 to the Massachusetts Mayors' Association as its share of $500,000 which that association seeks to use for a Statewide information campaign on the classification amendment. On June 28, 1978, the city executed two contracts which were filed with the city auditor. One, with Lee-Grigsby Associates in the amount of $123,000, provides for instruction to volunteers in effective voter communication about the classification amendment. On June 29, 1978, the city made a payment of $10,000 on that contract for work already performed. The other contract, in the amount of $100,000, calls for Butcher-Forde Consulting to conduct a study of the level of public understanding on the classification issue and to design informational materials and a strategy for their distribution. No payments have been made on this contract.

Funds to meet the city's obligations to the Massachusetts Mayors' Association and to Lee-Grigsby Associates and Butcher-Forde Consulting "were transferred from the Public Facilities Department to the Administrative Services Department by the City Auditor on June 28 and 29, 1978, with the approval of the Mayor under section 3B of the City Charter (St. 1909, c. 486)." The fiscal 1978 budget had no funds expressly designated for expenditures on behalf of the classification question. Because of the conclusions we reach, we need not decide whether the transfer of funds was authorized by the city charter.

The full court heard argument on July 13, 1978, and, on July 19, 1978, entered an order which is set forth in the margin.[5] That order enjoined the city from expending the funds appropriated for the Office of Public Information on Classification and from making payments pursuant to the contracts, described above, which were executed on June 28, 1978.

This opinion is in explanation of that order.

We conclude that (1) the city does not have authority to appropriate funds to be expended in support of the classification amendment, and (2) the First Amendment to the Constitution of the United States, applicable to the States through the Fourteenth Amendment, does not require that the city be authorized to appropriate funds to

_____

[5] "The City of Boston, its agents and employees, are enjoined from expending the funds appropriated by the city council on June 7, 1978, to meet the current expenses of the Office of Public Information on Classification and are further enjoined from making payments to Lee-Grigsby Associates or to Butcher-Forde Consulting pursuant to the contracts between those entities and the City of Boston, which contracts were executed and filed with the City Auditor on June 28, 1978. This order should not be construed as implied authority for the city to use municipal employees or to use other appropriated funds for the purpose of supporting the proposed classification amendment. No municipal officer or employee may be required or compelled to devote time during his or her regular working hours to solicit public support for the proposed classification amendment."

influence the result of the vote on the classification amendment. We consider first the city's appropriation authority, then consider the Federal constitutional question, and finally discuss the plaintiffs' requests for relief.

1. A municipality has no authority to appropriate funds for the purpose of taking action to influence the result of a referendum proposed to be submitted to the people at a State election. We reach this conclusion on the basis of the existence of broad regulatory legislation concerning the collection and expenditure of funds for election purposes.

We do not rest the result on the plaintiffs' claim that municipalities are restricted to appropriating funds solely for those purposes enumerated in G. L. c. 40, § 5. Section 5 of G. L. c. 40, as amended by St. 1951, c. 798, provides that a municipality may "appropriate money for the exercise of any of its corporate powers, including the following purposes: [listing numerous purposes]."[6] Neither as a matter of statutory construction nor in practice are municipal appropriations limited to those purposes enumerated in G. L. c. 40, § 5. There are other statutory provisions explicitly authorizing the appropriation of funds. See, e.g., G. L. c. 40, § 5A (reserve funds in cities); § 5B (stabilization funds); § 6A (limited amounts for advertising the municipality's resources, advantages, and attractions). Moreover, there are traditional municipal functions for which funds have been appropriated without any explicit statutory authorization beyond the general authorization to expend funds "for the exercise of any of its corporate powers." Contrary to the plaintiffs' contention, the Legislature has not manifested an intention after the enactment of the Home Rule Amendment in 1966 (art. 89 of the Amendments to the Constitution of the Commonwealth, amending art. 2 of those Amend-

---

[6] General Laws c. 40, § 5, refers to towns, but except as otherwise expressly provided, "all laws relative to towns shall apply to cities." G. L. c. 40, § 1.

ments) to limit the appropriation powers of municipalities to those purposes which are mentioned explicitly in legislation.[7] See *Bloom* v. *Worcester*, 363 Mass. 136, 155-156 (1973).

The Home Rule Amendment authorizes a municipality by ordinance or by-law to "exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight" of the Home Rule Amendment, provided the municipality's ordinance or by-law does not run contrary to its charter.[8] See art. 2 of the Amendments to the Massachusetts Constitution, as appearing in art. 89, § 6. See also § 13 of G. L. c. 43B, the Home Rule Procedures Act, to the same effect. The issue at the heart of the dispute concerning the city's authority to appropriate funds for the purpose of influencing the result on the referendum question is whether the city's purported home rule ordinance is inconsistent with any law enacted by the Legislature under the powers reserved to it under the Home Rule Amend-

---

[7] The plaintiffs argue that the Legislature must have intended G. L. c. 40, § 5, to be exhaustive on the subject of municipal appropriations because it has made additions to the list of permitted appropriations since adoption of the Home Rule Amendment. However, that conclusion is not required. Some recent additions may have been made to eliminate the need for the adoption of individual home rule ordinances and by-laws. Others contain restrictions on amounts which may be appropriated for particular purposes.

[8] The Home Rule Amendment disclaims any intention "to grant to any city or town the power to (1) regulate elections other than those prescribed by sections three and four [relating to charter commissions and charter amendments]." Art. 2 of the Amendments to the Constitution, as appearing in art. 89, § 7. It may be that the absence of authority to adopt a home rule ordinance or by-law regulating elections should be read as denying local authority to attempt to "regulate" the results as well as the procedures of elections. We need not decide this point because, even if art. 2, § 7, does not nullify any authority in art. 2, § 6, to enact the home rule ordinance before us, the result would be the same.

ment. On this point, we agree with the plaintiffs that the appropriation of funds by a municipality for the purpose of influencing the vote on a Statewide referendum question is "inconsistent with . . . laws enacted by the general court." We reach this result because comprehensive legislation, enacted after the adoption of the Home Rule Amendment, regulating election financing manifests an intention to bar municipalities from engaging in the expenditure of funds to influence election results. G. L. c. 55, as appearing in St. 1975, c. 151, § 1. This comprehensive legislation requires the reasonable inference that the Legislature "intended to preclude the exercise of any local power or function on the same subject because otherwise the legislative purpose of that statute would be frustrated." *Bloom* v. *Worcester, supra* at 155.

Chapter 55 is a detailed enactment entitled, "Disclosure and Regulation of Campaign Expenditures and Contributions." Its stated purposes are "to provide for public disclosure of political contributions and expenditures, and the regulation of said contributions and expenditures." See St. 1975, c. 151. "Expenditure" is defined to include an expenditure by a political committee "for the purpose of promoting or opposing a . . . referendum question . . . or other question submitted to the voters." § 1. That chapter regulates political committees which are defined to include "any committee, association, organization or other group of persons, . . . which . . . makes expenditures . . . for the purpose of opposing or promoting a . . . referendum question . . . or other question submitted to the voters." *Id*. It regulates the expenditure of money by such a committee (G. L. c. 55, §§ 5, 6, 9), and sets forth detailed reporting requirements (G. L. c. 55, § 18). Chapter 55 also places restrictions on the expenditure of funds by corporations, making explicit reference to various kinds of corporations, although not to a municipal corporation. § 8.[9]

---

[9] One restriction concerning the expenditure of corporate funds on a referendum question was held to be unconstitutional by a five-to-

We interpret G. L. c. 55 as intended to reach all political fund raising and expenditures within the Commonwealth. The absence of any reference to municipal corporations is significant, not as an indication that municipal action to influence election results was intended to be exempt from regulation, but rather as an indication that the Legislature did not even contemplate such municipal action could occur. We notice judicially that traditionally municipalities have not appropriated funds to influence election results. If the Legislature had expected that municipalities would engage in such activities or intended that they could, G. L. c. 55 would have regulated those activities as well. We thus construe G. L. c. 55 as preempting any right which a municipality might otherwise have to appropriate funds for the purpose of influencing the result on a referendum question to be submitted to the people at a State election.

Our conclusion that municipalities are barred from political activities of the character involved here is strengthened by other provisions of G. L. c. 55. Section 13 forbids a municipal employee (among others), other than an elected officer, from soliciting or receiving any payment of money for any political purpose whatever. No person shall solicit or receive any payment of money for such a purpose in a building occupied for municipal purposes. G. L. c. 55, § 14. Generally, no person in the service of a city shall deliver to another such person any money to be applied to "the promotion of any political object whatever." G. L. c. 55, § 15, as appearing in St. 1975, c. 151, § 1. Literally, these prohibitions apply to money appropriated by a municipality as fully as they do to funds derived from any other source. Even if these restrictions should not be construed as affecting municipal appropriations, they demonstrate a general legislative

---

four vote in *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978), reversing *First Nat'l Bank* v. *Attorney Gen.*, 371 Mass. 773 (1977).

intent to keep political fund raising and disbursing out of the hands of nonelective public employees and out of city and town halls.[10]

The defendants have brought to our attention St. 1978, c. 572, which was signed by the Governor on July 22, 1978, after the argument of this case. This act, which is not effective until ninety days from July 22, 1978 (art. 48, The Referendum, I), inserts G. L. c. 55, § 22A. Section 22A requires the treasurer of each municipality which has "given, paid, expended or contributed, or promised to give, pay, expend or contribute any money or any valuable thing in order to influence or affect the vote on any question submitted to the voters of the commonwealth . . . [to] file reports with the director [of campaign and political finance] setting forth the amount or value of every gift, payment, expenditure of [*sic*] contribution or promise to give, pay, expend or contribute, together with the date, purpose, and full name and address of the person to whom it was made." Criminal penalties are provided for

---

[10] We need not pass on the plaintiffs' further claim that the appropriation of funds to be spent in support of the adoption of the classification amendment is not a constitutionally permissible public purpose. The adoption of the classification amendment would not produce by itself any additional revenue for the city. Assuming that any legislation implementing the classification amendment were to create classifications potentially favorable to single family residences or owner-occupied premises (a likely assumption), the pattern of disproportionate assessments extant in Boston might not be substantially disrupted. Thus the city's support of the classification amendment might be viewed as an attempt to legitimatize its admittedly unconstitutional assessment practices. But, as we have said, we do not have to decide whether the expenditure of municipal funds in support of the classification amendment is a public purpose. We recognize, however, that there may well be situations in which a public purpose would be served by municipal advocacy. We would give, of course, considerable deference to legislative findings concerning the existence of a public purpose in such situations. See *Opinion of the Justices*, 337 Mass. 777, 781 (1958).

We also need not pass on the plaintiffs' claims that the proposed use of municipal funds violates equal protection and due process principles expressed in the Constitutions of the United States and of the Commonwealth.

any government officer who violates any provision of the section. The director "may order restitution of public funds which have been adjudicated to have been spent contrary to law by public officials." The section provides expressly that "[n]othing contained herein shall be construed as authorizing the expenditures of public monies for political purposes."

Clearly, St. 1978, c. 572, does not authorize the expenditures in issue here. Not only is it not yet effective, but we find in it no implication that municipalities may expend public funds to influence or affect the vote on a Statewide referendum. The requirement that a municipal treasurer report all expenditures of public funds for such a purpose does not mean that the Legislature has altered its position barring the use of such funds for political purposes. The section seemingly disclaims such an inference. Moreover, it acknowledges that there may be adjudications that such funds may have been spent contrary to law and authorizes the director to order restitution of such funds.[11]

2. We turn then to the defendants' assertion that, even in the presence of a legislative direction that no munici-

---

[11] We are not concerned here with the First Amendment or other right of a municipality to expend public funds to influence legislative action. Municipal action concerning legislation has statutory, traditional, and constitutional foundations which are not applicable to municipal action on questions submitted to the people. There is express authorization for the use of public funds for the purpose of influencing the legislative process. See G. L. c. 40, § 5(15), relating to employment of counsel to appear before a committee of the Legislature. See also G. L. c. 3, § 50, as amended by St. 1976, c. 458, § 4, which exempts municipal employees and agents "who are acting in their capacity as such employees or agents" from legislation regulating lobbying. Moreover, quite apart from legislative authorization, there is a tradition of localities acting through their officials and employees to obtain legislative action in their favor. Indeed, the Home Rule Amendment itself contains procedures by which an individual city or town may seek legislative authorization for particular action by it. Art. 2 of the Amendments to the Massachusetts Constitution, as appearing in art. 89, § 8. The city did not avail itself of that opportunity in this instance.

pal funds be expended for the purpose of influencing the result of a referendum, the city has a First Amendment right to expend public funds in an attempt to obtain an affirmative vote on the classification amendment.

We are offered little assistance from prior decisions. Although for more than fifty years the due process clause of the Fourteenth Amendment has protected liberty of speech from invasion by State action (see *Gitlow* v. *New York,* 268 U.S. 652 [1925]; *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765, 779 [1978]), there has been almost no judicial consideration of the impact of rights of freedom of speech on the right of State or local governments to use public funds to advocate a position on a question being submitted to the voters.[12] The only relevant opinion of which we

---

[12] Various opinions have held, without discussion of the possible impact of constitutional principles of freedom of speech, that a municipality or a similar political subdivision may not expend public funds for the purpose of influencing the result on an election question. See *Mines* v. *DelValle,* 201 Cal. 273 (1927) (bond issue); *Elsenau* v. *Chicago,* 334 Ill. 78 (1929) (bond issue); *Porter* v. *Tiffany,* 11 Or. App. 542 (1972) (referendum on bond issue and initiative measure). Cf. *Sims* v. *Moeur,* 41 Ariz. 486 (1933) (use of State workmen's compensation fund to oppose initiative measure); *Stanson* v. *Mott,* 17 Cal. 3d 206 (1976) (use of State funds to promote a bond issue). A California statute authorizes a local legislative body to file for publication a written argument for or against any measure going before the municipal voters. See *Ferrara* v. *Belanger,* 18 Cal. 3d 253 (1976).

In 1946, by an eight-to-four vote, the Court of Errors and Appeals of New Jersey held that "a municipality may lawfully publicize, at public expense, what its governing body conceives to be sound reasons, relating to the essential local welfare, for the rejection by the people of the state of proposed amendments to the constitution." *City Affairs Comm. of Jersey City* v. *Commissioners of Jersey City,* 134 N.J.L. 180 (1946). Here, again, the focus was on the authority of a political subdivision. No mention was made of the First Amendment, although the court's discussion on informing and advising the electorate is relevant to First Amendment principles. In *Citizens to Protect Public Funds* v. *Board of Educ. of Parsippany-Troy Hills,* 13 N.J. 172 (1953), the Supreme Court of New Jersey, in an opinion by now Mr. Justice Brennan of the United States Supreme Court, discussed the use of municipal funds to seek support for a school bond issue. The court imposed a significant limitation on the broad principle expressed seven years earlier by the former Court of Errors and Appeals, saying, "We are

are aware is that of a New York trial court which preliminarily enjoined the division of human rights of the State of New York and its commissioner from "supporting, promoting, campaigning or otherwise acting to achieve passage of the proposed Equal Rights Amendment to the New York State Constitution." *Stern* v. *Kramarsky*, 84 Misc. 2d 447, 453 (N.Y. Sup. Ct. 1975). The court concluded that the defendants had no statutory authority to engage, as public officials or employees, in activities in support of the Equal Rights Amendment and rejected the defendants' argument that an injunction would abridge their rights of freedom of speech and association.[13]

persuaded, however, that simple fairness and justice to the rights of dissenters require that the use by public bodies of public funds for advocacy be restrained" in the absence of express legislative authorization. *Id.* at 182. The court indorsed the use of public funds for the expression of views pro and con. "It is the expenditure of public funds in support of one side only in a manner which gives the dissenters no opportunity to present their side which is outside the pale." *Id.* As in other cases, the impact of First Amendment principles was not addressed. In 1947, Professor Chafee observed that government as a party to communications "is a subject hitherto neglected." 2 Z. Chafee, Jr., Government and Mass Communications 723 (1947). He put, but did not answer, the question: "How far is it right that the money of the taxpayers, especially those in the opposite party, should be spent, in a way, as a subtle campaign fund?" *Id.* at 763. As we have noted, until this case, the subject of government as a party to communications has continued generally to be neglected in its constitutional aspect. See *Madison Joint School Dist. No. 8* v. *Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175 n.7 (1976), where the Court did not have to decide whether a municipal corporation had First Amendment rights to hear the views of citizens and employees.

[13] The court said the issue was "not one concerning freedom of speech or association, but whether it is a proper function of a State agency to actively support a proposed amendment to the State Constitution which is about to be presented to the electorate in a State-wide referendum." *Id.* at 449-450. In language of such force as to suggest that a statute authorizing partisan advocacy would be of doubtful constitutionality, the court said that the democratic process would be demeaned by the advocacy by State agencies, a practice which "cannot be tolerated, directly or indirectly in these democratic United States of America." *Id.* at 452. It accepted the concept of public funds being

We abstain from expressing the issue before us in terms of whether a municipality "has" First Amendment rights and what the scope of those rights may be. "Instead, the question must be whether [the Commonwealth's denial of the right to the city to expend funds in support of the classification amendment] . . . abridges expression that the First Amendment was meant to protect." *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765, 776 (1978). In other words, is speech of the character involved here, expressed by a political subdivision of a State, speech which the First Amendment was intended to protect? The First Amendment, of course, restrains States from barring others from expressing ideas. By its terms and in its traditional applications, the First Amendment has nothing to do with a State's determination to refrain from speech on a given topic or topics and to bar its various subdivisions from expending funds in contravention of that determination. There are, no doubt, constitutional restrictions on governmental speech even where the subject under discussion is one at the heart of the First Amendment's protection.[14] On the other hand, there are a variety of instances in which government funds are used lawfully to express views and conclusions on matters of importance where various taxpayers may disagree with those views and conclusions. The Constitution of the

used to educate and inform and to promote voting on an election issue, and recognized that public employees could argue for or against a proposition in their individual capacities as private citizens.

[14] Surely, the Constitution of the United States does not authorize the expenditure of public funds to promote the reelection of the President, Congressmen, and State and local officials (to the exclusion of their opponents), even though the open discussion of political candidates and elections is basic First Amendment material. Government domination of the expression of ideas is repugnant to our system of constitutional government. In this Commonwealth, we might find a constitutional bar to such an attempt at political self-perpetuation in art. 9 of the Declaration of Rights of our Constitution, concerning free elections, and in consideration of equal protection and due process of law.

United States, thus, does not forbid all government communications and publications which are not neutral and purely informative. We need not explore, however, how far constitutional considerations may limit the Federal and the State governments from expending otherwise lawfully appropriated funds to advance a partisan position by publication of documents and advertisements in support of that view. Here, we are presented with the issue whether constitutionally protected speech includes the right of a municipality to speak militantly about a referendum issue of admitted public importance where the Legislature of the State has said it may not. The Supreme Court has left open the possibility that restrictions on speech would be valid as to private corporations which would not be valid as to individuals. *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765, 777 n.13 (1978). Although we suspect that the First Amendment has nothing to do with this intra-State question of the rights of a political subdivision to disregard the mandate of the supreme legislative authority of the State, no matter how important the topic desired to be placed under discussion and even in the absence of a compelling State interest in suppressing discussion, we need not resolve this point. Even if we were to assume that the appropriation of funds by a municipal corporation to engage in robust, partisan speech is expression that the First Amendment was meant to protect, there are demonstrated, compelling interests of the Commonwealth which justify the "restraint" which the Commonwealth has placed on the city.[15]

---

[15] Another aspect of the question whether protected speech is implicated here at all concerns whether the appropriation of public funds involves protected speech. We know that the act of making political contributions and expenditures involves protected speech and not merely conduct. *Buckley* v. *Valeo,* 424 U.S. 1, 14 (1976). The means by which a donor acquires funds which are given to finance political expression is one step further removed from the expression itself and was not considered in *Buckley* v. *Valeo.* Surely, the First Amendment does not justify the stealing of funds or of a printing press

In this phase of our analysis we assume that the expenditure of municipal funds to promote adoption of the classification amendment involves expression protected by the First Amendment, and we conclude that a State-imposed restriction on such an expenditure survives the exacting scrutiny to which such a restriction must be subjected. See *First Nat'l Bank* v. *Bellotti, supra* at 786.

In assessing the government's interest in regulating speech, the right to speak or to be heard must be measured by a balancing of interests. See *Pickering* v. *Board of Educ.*, 391 U.S. 563, 568 (1968). For example, the constitutional rights of government employees to participate in partisan political activities "cannot be defined independent of the contexts in which they are asserted." L.H. Tribe, American Constitutional Law § 12-23, at 706 (1978). See *Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973); *United States Civil Serv. Comm'n* v. *National Ass'n of Letter Carriers*, 413 U.S. 548, 564 (1973); *United Pub. Workers of America* v. *Mitchell*, 330 U.S. 75, 95-96 (1947). See also *Greer* v. *Spock*, 424 U.S. 828 (1976). So, too, here First Amendment rights must be assessed in the context in which the governmental restriction arises.

The Commonwealth has a substantial, compelling interest in assuring the fairness of elections and the appearance of fairness in the electoral process. It may protect that interest by excluding its political subdivisions from partisan involvement in election questions, where the means employed are "closely drawn to avoid unnecessary abridgement . . . [of First Amendment freedoms]." *First Nat'l Bank* v. *Bellotti, supra* at 786, quoting from *Buckley* v. *Valeo*, 424 U.S. 1, 25 (1976).

---

because the defendant was planning to use the funds or the printing press to publish his views on a subject of public concern. Governmental restraint, even prior restraint, plainly is appropriate in such a case, and the justification for that restraint may be that the wrongful act is not protected expression as much as the justification for the restraint that may be a compelling State interest in recovering the stolen property.

The Commonwealth's strong interest in free and fair elections is expressed in the Constitution of the Commonwealth. Article 9 of the Declaration of Rights provides that "[a]ll elections ought to be free." We have already noted that the Home Rule Amendment disclaims any grant to municipalities to regulate elections. Article 48, General Provisions, IV, as appearing in art. 74, § 4, concerning referenda, sets forth a procedure by which the Secretary of the Commonwealth (Secretary) must send every registered voter "the full text of every [referendum] measure to be submitted to the people, together with a copy of the legislative committee's majority and minority reports, if there be such, . . . a statement of the votes of the general court on the measure, and a fair, concise summary of the measure as such summary will appear on the ballot; and shall, in such manner as may be provided by law, cause to be prepared and sent to the voters other information and arguments for and against the measure." This constitutional provision assures disclosure to every voter of the nature of each referendum before the date of the election and places in the Legislature the determination of what "other information and arguments for and against" may be distributed.

To implement the constitutional mandate, the Legislature made a determination of what other information and arguments should be distributed. It has enacted provisions concerning the dissemination of information to the people on any question which will appear on the Statewide ballot. G. L. c. 54, §§ 53, 54, as appearing in St. 1977, c. 898. The Secretary must distribute to each residential address and to each voter residing in group residential quarters, copies of each referendum measure, "summaries prepared by the attorney general, a one-sentence statement describing the effect of a yes or no vote prepared by the state secretary, and, as provided in section fifty-four, arguments for and against measures to be submitted under [art. 48] of the Amendments to the Constitution." Section 54 requires each argument to be limit-

ed to 150 words. Pursuant to that section, the Secretary must seek arguments from the principal proponents and opponents of each referendum petition.

The people have expressed a strong interest that the Legislature have the authority to determine what, if any, material will be disseminated on a referendum proposal. The Legislature may decide, as it has, that fairness in the election process is best achieved by a direction that political subdivisions of the State maintain a "hands off" policy. It may further decide that the State government and its various subdivisions should not use public funds to instruct the people, the ultimate authority, how they should vote. That determination avoids the possibility of a babel of municipal huckstering and reserves the financing of public debate for nongovernmental agencies and individuals.[16] See *Buckley* v. *Valeo, supra* at 57.

Fairness and the appearance of fairness are assured by a prohibition against using public tax revenues to advocate a position which certain taxpayers oppose. The Com-

---

[16] Professor Emerson noted that one category of issues involving the protection which legal institutions must provide for a system of freedom of expression concerns the restriction of government. "The issues turn on the special character of government expression and the need for special protection to the system through rules such as requiring the government to make a balanced presentation of the issues." T.I. Emerson, The System of Freedom of Expression, at 19 (1970). In his chapter concerning Government Participation in the System of Freedom of Expression, he notes that "[n]o comprehensive effort to appraise the government role or to formulate principles of control has been undertaken." *Id.* at 698. He states that the government's right of expression should "not extend to any sphere that is outside the governmental function," and cites as an excluded area, "direct support of a particular candidate for office," noting that "[i]t is not the function of the government to get itself reelected." *Id.* at 699. Professor Emerson does not otherwise define the scope of "the governmental function." If we were to apply Professor Emerson's statement of limitations to the government's right of expression, we would express our conclusion in this case as follows: A political subdivision is acting outside its governmental function when it seeks to expend public funds to tell the people how to vote on constitutional referenda issues which would affect provisions for raising tax revenues.

monwealth's interest in fairness and in the appearance of fairness is particularly significant in the face of the defendants' argument that no limit may be imposed on the city's expenditure of tax revenue for vigorous advocacy on a referendum question.[17] On this view, the Commonwealth is apparently powerless against political entities of its own creation.[18]

Assuming that the Commonwealth has no right to restrict such advocacy where there is no opposition from any affected citizen, the Commonwealth has a compelling interest in restricting such advocacy where the affected citizenry are not in unanimity. The Commonwealth has an interest in assuring that a dissenting minority of taxpayers is not compelled to finance the expression on an election issue of views with which they disagree. Unlike the shareholders of a private corporation (see *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 [1978]), real estate taxpayers such as the plaintiffs cannot avoid the financial consequences of the city's appropriation of funds. The additional revenues that must be raised to finance the appropri-

---

[17] In numerous areas, the Legislature has imposed limitations on the expenditure of municipal funds, manifesting a legitimate concern for protecting the public purse. See, e.g., G. L. c. 40, § 5 (15), (27), (34), (37), (41), (42), (43), (46A), (47), (67), (71); § 5A; § 5B; § 6; § 6A. Some of these limitations relate to the gathering or dissemination of information. For example, G. L. c. 40, § 6A, regulates the amount which a municipality, which has accepted the section, may appropriate annually for the purpose of advertising its resources, advantages, and attractions.

[18] The defendants point out that possibilities of abuse of a municipality's alleged right of advocacy cannot abridge otherwise protected speech. The facts in the record do not demonstrate that the city will abuse its alleged right of advocacy, such as by issuing deceptive, vindictive, or coercive publications, nor does the record show that the city's publications would be monopolistic, or even domineering, or that they are calculated to perpetuate any official in office. In their brief, the defendants concede that, unlike private corporations (see *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 784 [1978]), "the danger that public debate will be overwhelmed by the speech of public entities may well warrant a prophylactic rule restricting speech by government bodies to matters closely related to their official responsibilities."

ations made in May of this year will be reflected in the taxes which will be assessed, as of January 1, 1978, on the plaintiffs' property for the fiscal year commencing July 1, 1978. G. L. c. 59, §§ 21, 57. The coercion which a majority of the Supreme Court found absent in *First Nat'l Bank v. Bellotti, supra* at 794 n.34, is thus present here. And the objectors are not hypothetical. They have identified themselves by bringing this action.[19] This case is more analogous to *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235-236 (1977), where the Supreme Court struck down

---

[19] In *First Nat'l Bank v. Bellotti, supra* at 795, the Court noted that minority shareholders of a private corporation were not defenseless against the use of corporate funds for political expression. One remedy included "access to the judicial remedy of a derivative suit to challenge corporate disbursements alleged to have been made for improper corporate purposes." The implication of this statement is that a corporate charter or by-law forbidding the use of corporate funds for political purposes would be enforceable by the State, even when the management of the corporation wanted to speak out on a subject of public interest. The plaintiffs' action against a municipal corporation procedurally parallels a shareholder's derivative suit against a private corporation. This action is thus an aspect of corporate democracy whose validity the Supreme Court seemingly acknowledged in *First Nat'l Bank v. Bellotti.*

As Professor Tribe points out in discussing the appropriate method of handling a union's participation in communications with which an employee compelled to contribute disagrees, "A better solution might well be to require ideological activities unrelated to collective bargaining to be financed from voluntary contributions in the first place." L.H. Tribe, American Constitutional Law § 12-4, at 589 n.5 (1978). Further, he disregards any attempt to distinguish the union cases from situations in which a taxpayer is compelled to contribute to a State's message with which the taxpayer disagrees. In a statement seemingly prophetic of the result we reach, he says, "Any notion that the very relation of taxpayer to government makes the refund argument inherently inapt seems refuted by positing a hypothetical instance in which, say, half the state budget of New Hampshire goes toward broadcasting 'Live Free or Die' across the countryside. [See *Wooley v. Maynard*, 430 U.S. 705 (1977)]. In such a case, even assuming that this allocation of public resources does not itself violate the first and fourteenth amendments, the Supreme Court should probably conclude that the broadcast cannot constitutionally be financed with the involuntary contributions of persons who disagree with the message." *Id.* at 590-591 n.8.

involuntary contributions by government employees to a union's political expression.[20]

3. We come finally to the relief to which the plaintiffs are entitled. They seek an injunction against the city and its employees from taking certain action for the purpose or effect of influencing the outcome of the vote on the classification amendment. They ask that the city be enjoined from "'(a) authorizing, disbursing, appropriating or spending any funds of the City of Boston therefor; (b) allowing, directing, encouraging, requesting or permitting any employee of the City of Boston, during normal working hours and while on the municipal payroll, directly or indirectly, to devote any time or service therefor, (c) allowing, directing, encouraging, requesting or permitting any person to use any building, office, telephone, stationery, automobile or other resource in the possession, ownership, custody or control of the City of Boston therefor."

A. The order which was entered on July 19, 1978 (see n.5 above), dealt with the expenditure of funds. Such an order is appropriate in an action brought under G. L. c. 40, § 53, where a municipality is about to raise or expend money for purposes not authorized by law. *Dealtry* v. *Selectmen of Watertown*, 279 Mass. 22, 27 (1932). That order enjoins the city from using any funds specifically appropriated to be used to influence the vote on the classification amendment. Of course, the city has no authority to use any other appropriated funds, including the services of any employees paid from funds appropriated for other purposes, for the purpose of influencing that

[20] If the proper remedy in union cases is that the dissenting member should not be obligated to pay that portion of his dues attributable to political activities (see *First Nat'l Bank* v. *Bellotti, supra* at 794 n.34), the remedy here is that any dissenting taxpayer should not be obliged to pay that portion of his local real estate taxes attributable to the city's political activities on the referendum proposal. Such a result, however, can be achieved more effectively by striking the entire appropriation and letting those who wish to do so make their own contributions directly to the cause.

vote. In our discretion, however, we decline to issue an order concerning municipal funds of any greater breadth than that already entered. We anticipate that the city will adhere to the requirements of law which are stated in this opinion. See *Bennett* v. *Assessors of Whitman,* 354 Mass. 239, 241-242 (1968).

No claim has been made concerning the recovery of funds already expended. Normally, G. L. c. 40, § 53, "does not authorize the undoing of completed transactions." *Spear* v. *Boston,* 345 Mass. 744, 746 (1963). In any event, neither the Massachusetts Mayors' Association, which received $112,550 from the city, nor Lee-Grigsby Associates, which received a $10,000 payment on its contract, is a party to this proceeding. We decline to express any view concerning whatever obligation there may be to restore, or to seek to recover, these amounts which were paid not only after this action was commenced but also after the defendants had knowledge of the action.

B. In the absence of specific evidence of action by a municipal employee during his or her working hours in support of the classification amendment, we decline to issue an injunction or to make any specific declaration concerning the lawful limits of such conduct. At oral argument, the plaintiffs conceded that the mayor and persons in relevant policy-making positions in city government are free to act and to speak out in support of the classification amendment. Individual city employees may have certain rights of speech, even during working hours, concerning the classification amendment, and it is preferable that they be heard before any injunction which may affect those rights is issued.

In our July 19, 1978, order we observed that the injunctions against the use of specifically appropriated funds should not be construed "as implied authority for the city to use municipal employees or to use other appropriated funds for the purpose of supporting the proposed classification amendment." We cannot determine on this record what employees of the city may or may not speak out on

the classification amendment during working hours. We did declare in our order that "[n]o municipal officer or employee may be required or compelled to devote time during his or her working hours to solicit public support for the proposed classification amendment."[21] This much clearly follows from the general conclusion that city funds may not be used to advocate an affirmative response on the classification amendment. Any further order from this court on this question on the conduct of city employees is not possible on this record.

C. Our order made no explicit reference to the use of city facilities, equipment, and supplies to advocate adoption of the classification amendment. The city intends to use office space and telephones for this purpose and to make them available to volunteers. It also intends to provide printed materials for distribution to the voters. From what we have said, it is apparent that the city's use of telephones and printed materials provided by public funds, and its use of facilities paid for by public funds, would be improper, at least unless each side were given equal representation and access. See *Police Dept. of Chicago* v. *Mosley*, 408 U.S. 92, 96 (1972); *Bonner-Lyons* v. *School Comm. of Boston*, 480 F.2d 442, 444 (1st Cir. 1973). Here, however, the record shows no specific examples of the use of the city's facilities, equipment, and supplies. In light of what we have said on this subject, we expect that the city will recognize the limitations on its authority and will conform to them.

Because all relief to which the plaintiffs are entitled can be granted in a ten-taxpayers' action under G. L. c. 40, § 53, we need not consider the question whether the plaintiffs have standing to seek relief separately or additionally in a declaratory judgment proceeding (G. L. c. 231A).

---

[21] This restraint, of course, prohibits the imposition of any sanction on any employee for his or her failure to "volunteer" to participate in action in support of the classification amendment.